IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re | ) ) | Chapter 11 |
| TOUGH MUDDER INC., *et al.*,[1] | ) ) | Case No. 20-10036 (CSS) |
| Debtors. | ) ) ) | Joint Administration Requested |

**AFFIDAVIT OF PUBLICATION OF THE NOTICE OF PROPOSED FREE AND
CLEAR SALE IN THE NEW YORK TIMES**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tough Mudder Inc. (2576) and Tough Mudder Event Production Inc. (6845). The Debtors' address is 15 MetroTech Center, Brooklyn, NY 12201.



**620 8TH AVENUE · NEW YORK, NY 10018**

# PROOF OF PUBLICATION

Feb 18        20 20

I, Alice Weber, in my capacity as a Principal Clerk of the Publisher of **The New York Times**, a daily newspaper of general circulation printed and published in the City, County and State of New York, hereby certify that the advertisement annexed hereto was published in the editions of **The New York Times** on the following date or dates, to wit on

FEB 17 2020      B4 NATIONAL

Sworn before me the
18th day of Feb, 2020

Notary Public

MICHELLE M. SCIBILIA
Notary Public, State of New York
Registration #01SC6281145
Qualified In Nassau County
Commission Expires May 13, 2021

---

**IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE**

In re TOUGH MUDDER INC. and TOUGH MUDDER EVENT PRODUCTION INC., Debtors.
Chapter 11
Case No. 20-10036 (CSS)
Case No. 20-10037 (CSS)

**NOTICE OF PROPOSED FREE AND CLEAR SALE**

PLEASE TAKE NOTICE THAT Derek C. Abbott, the chapter 11 trustee (the "Trustee") of the above-captioned debtors (the "Debtors") has filed a motion (the "Sale Motion") seeking approval to sell substantially all of the Debtors' assets **free and clear of all liens, claims, encumbrances, and other interests** and related relief. A hearing to consider approval of the Sale Motion is scheduled for **February 25, 2020, at 1:00 p.m. (EST)** at the U.S. Bankruptcy Court for the District of Delaware (the "Court"), 824 N. Market Street, 5th Floor, Courtroom #6, Wilmington, DE 19801. Objections, if any, to the entry of an order granting the relief requested by the Sale Motion must be made in writing, filed on the Court's docket for these cases no later than **February 20, 2020, at 4:00 p.m. (EST)** (the "Objection Deadline"), and served on proposed counsel to the Trustee as follows so as to be received by the Objection Deadline: Morris, Nichols, Arsht & Tunnell LLP, 1201 N. Market Street, 16th Floor, Wilmington, DE 19801, Attn: Matthew B. Harvey (mharvey@mnat.com). Copies of the Sale Motion and other documents filed in the Debtors' chapter 11 cases are available free of charge upon reasonable request to the proposed counsel to the Trustee identified above, at the offices of the Clerk of the Court during normal business hours, or on the Court's electronic docket at ecf.deb.uscourts.gov (registration required and fees may apply).

IF YOU FAIL TO OBJECT TO THE SALE, THE DEBTORS' ASSETS MAY BE SOLD FREE AND CLEAR OF ANY LIEN, CLAIM, ENCUMBRANCE, OR OTHER INTEREST YOU MAY HOLD AGAINST THE DEBTORS OR THEIR ASSETS.

## ENTREPRENEURSHIP | REAL ESTATE

  

Moka Origins occupies a barn on the grounds of the Himalayan Institute, a yoga and meditation retreat in northeastern Pennsylvania.

Grinding beans into chocolate takes three days. The beans are bought from farmers in Cameroon. Moka makes 2,000 to 4,000 bars a month.

The co-founders of Moka Origins, Jeff Abella, left, and Ishan Tigunait. They want to help subsistence farmers find better ways to earn money.

# Making Coffee, Chocolate and, They Hope, a Better World

**By JESSICA STEINBERG**

HONESDALE, PA. — Ask Jeff Abella if he likes coffee, and he'll say yes.

Truth is, he can take it or leave it.

It was Mr. Abella, however, who lugged pounds of coffee (and cacao) beans from Cameroon in his suitcase and roasted them in his kitchen toaster oven during a yearlong testing process to create premier coffee and signature chocolate bars.

They are the core products of Moka Origins, the boutique roaster and retailer that Mr. Abella founded with Ishan Tigunait in a former dairy barn on the grounds of the Himalayan Institute, a yoga and meditation retreat in northeastern Pennsylvania.

Mr. Abella, who is the chief executive, and his team of seven are bootstrapping this business for a greater purpose. The beans are part of the institute's humanitarian efforts to help subsistence farmers find better ways to earn money and support themselves under better conditions.

Moka Origins winnows about 1,000 pounds of coffee each month and prepares 2,000 to 4,000 bars of chocolate. Also, several Moka cafes are being opened across the United States.

It's not about the coffee or the chocolate, however. It's about social entrepreneurship.

More entrepreneurs are pursuing social or environmental goals, said Greg Brown, a professor of finance at the Kenan Institute of Private Enterprise at the University of North Carolina.

Companies like Toms, Warby Parker and Uncommon Goods have pushed this concept into the mainstream by creating successful business models built around helping others. This trend has led to the rise of B Corporations, a certification for companies that meet high standards of social responsibility. The program started in 2007, and now more than 2,500 companies have been certified in more than 50 countries.

Companies like Moka are a reflection of how consumers think as well, Professor Brown said. As people's wealth increases, they think more about quality and less about quantity. They also consider the social context of what they're buying.

Olga Hawn, director of the Center for Sustainable Enterprise at the University of North Carolina, visits socially driven companies around the world with her students in the summer. They have met with artisanal chocolate makers in Ecuador, tea purveyors in the Amazon and ceramic artists in Peru.

Some of the companies are huge successes, but others struggle mightily before closing. A cooperative of 300 ceramic artisans in Peru, for instance, failed because its products didn't sell, said Dr. Hawn, an assistant professor of strategy and entrepreneurship.

But others have found the right product. Pacari, an organic Ecuadorean chocolate company, was created by Santiago Peralta and Carla Barboto, who work with 350 small-scale farmers. Their chocolate is winning awards, and they are being approached by giant chocolate makers.

"It's that good story that makes you feel good about buying the product," Dr. Hawn said. But entrepreneurs still need demand for the product to make a profit. "Even if you want to help, it has to help you, in some way," she said.

It's difficult for most socially driven entrepreneurs to find a balance between promoting a product and helping those in need. They do not necessarily know if they have to have organic products or be registered as a fair-trade company. Those designations have value, but they take time to achieve.

Entrepreneurs with a sustainability mission may be using beans from Africa or Ecuador and pouring money back into subsistence farms, Dr. Hawn said, but their product, branding and marketing look elite, which is part of their strategy to stand out.

The successful companies often have Western founders, she said.

"They can find resources more easily," she said. "They get the awards from the United Nations. They know how to connect to Western markets as well; the Westerners tell the story better."

Mr. Abella said the hours that he had spent perfecting his products were secondary to his work in Cameroon with the farmers.

He and his wife, Chelsea, spend half their time in Cameroon, helping farmers create sustainable businesses with environmentally friendly practices and finding methods to increase output. Mr. Abella wanted to find a market for those crops, rather than continuing to write grant proposals and create crowdfunding videos.

"These are small family farms, and you're trying to do organic and fair trade, but their organizational structure is very weak," Mr. Abella said. "There's no drinking water there, no paved roads and very little formal education."

He took his products back to Cameroon to show the farmers what was being made from the fruit that grew on their trees. They were stunned, he said, having never tasted coffee or chocolate before.

"It was such a realization that the farmer was growing this on their trees, we're spending a ton of money on a latte, and there's this whole imbalance in between," Mr.



PHOTOGRAPHS BY JEENAH MOON FOR THE NEW YORK TIMES
A tasting event at Moka Origins. Some of Moka's first customers were the summer camps dotting the hills and lakes of the Poconos region.

Abella said.

The biggest bottleneck for farmers in developing countries is not production but not knowing how to market what they have grown, said Purvi Mehta, who heads the Asia agriculture department for the Bill & Melinda Gates Foundation.

"People do know how to grow, but farmers remain poor because of lack of market," said Ms. Mehta, who is based in New Delhi. A project like Moka Origins is niche, she said, but it has given a corner of Africa access to the market in the United States.

Some of Moka Origin's first customers were the summer camps dotting the hills and lakes of the Poconos region.

"We love knowing that by drinking Moka coffee, we plant trees," said Benjy Goldberg, who directs retreats during the off-season at Camp Ramah in the Poconos, which set up Moka stations for staff last summer and offers the chocolate bars to guests.

"We always try to buy local," he added, "and when we met Moka and learned about how they incorporate social responsibility and sustainability, it was an easy choice for us as a Jewish educational camp."

Socially driven companies are an increasingly middle-class concept, Professor Brown said. Consumers will often choose the more expensive chocolate bar from a company whose profits benefit someone in need.

"People are looking for an emotional connection to something," he said.

Mr. Abella found through a lot of research that the beans he was bringing back from Cameroon could be made into premium coffee. Around the same time, he also began working on a small batch of chocolate bars, buying cocoa beans from farmers and roasting them to make 100 bars each week.

He spent all of 2016 logging 20-hour days, restoring the 100-year-old dairy barn and learning about certifications, packaging and producing coffee and chocolate. His wife practiced the packaging for the Moka bars by cutting brown butcher paper into different shapes in their kitchen.

"We had to figure it out ourselves, whether it was roasting or business strategy," he said.

He found that one of the biggest challenges in starting a small business was the necessity of doing it all without help.

"We're doing our best with resources that barely exist. We're taking on a lot too soon because of our values," Mr. Abella said. "Instead of hiring a team of chocolatiers, we're learning it ourselves."

## *A Luxury Apartment Rises in a Poor Neighborhood. Are Rent Increases Next?*

**By EMILY BADGER**

New apartment buildings often look to activists like precisely the problem. Let developers build more housing, particularly in poorer neighborhoods, and tenant groups and neighbors fear the market will heat up and their rents will rise.

Economists, on the other hand, tend to see new buildings as the solution. The only way to ease a housing shortage that's pushing up rents, they say, is to build more housing. Construct enough of it — even if it's high-end housing — and rents in general will fall.

The tension between these views sits at the center of battles over individual buildings and broader fights over how to alleviate the housing crisis. And until recently, there has been almost no data at the neighborhood scale to resolve it. It's even plausible that

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE
In re: TOUGH MUDDER INC., and    Chapter 11
TOUGH MUDDER EVENT           Case No. 20-10036 (CSS)
PRODUCTION INC.,                     Case No. 20-10037 (CSS)
Debtors.
NOTICE OF PROPOSED FREE AND CLEAR SALE
PLEASE TAKE NOTICE THAT Derek L. Abbott, the chapter 11 trustee (the "Trustee") of the above-captioned debtors (the "Debtors") has filed a motion (the "Sale Motion") seeking approval to sell substantially all of the Debtors' assets free and clear of all liens, claims, encumbrances, and other interests and related relief. A hearing to consider approval of the Sale Motion is scheduled for February 25, 2020, at 1:00 p.m. (EST) at the U.S. Bankruptcy Court for the District of Delaware (the "Court"), 824 N. Market Street, 5th Floor, Courtroom #6, Wilmington, DE 19801. Objection, if any, to the entry of an order granting the relief requested by the Sale Motion must be made in writing, filed on the Court's docket for these cases no later than February 20, 2020, at 4:00 p.m. (EST) (the "Objection Deadline"), and served on proposed counsel to the Trustee as follows so as to be received by the Objection Deadline: Morris, Nichols, Arsht & Tunnell LLP, 1201 N. Market Street, 16th Floor, Wilmington, DE 19801, Attn: Matthew B. Harvey (mharvey@mnat.com). Copies of the Sale Motion and other documents filed in the Debtors' chapter 11 cases are available free of charge upon reasonable request to the proposed counsel to the Trustee identified above, at the offices of the Clerk of the Court during normal business hours, or on the Court's electronic docket at ecf.deb.uscourts.gov/(registration required and fees may apply).
IF YOU FAIL TO OBJECT TO THE SALE, THE DEBTORS' ASSETS MAY BE SOLD FREE AND CLEAR OF ANY LIEN, CLAIM, ENCUMBRANCE, OR OTHER INTEREST YOU MAY HOLD AGAINST THE DEBTORS OR THEIR ASSETS.

both stories could be true at the same time — that new housing might help lower rents across a metro area even as it signals the popularity of a particular neighborhood and nudges up rents nearby.

Several new studies finally offer some evidence that is encouraging, if incomplete. Researchers at N.Y.U., the Upjohn Institute and the University of Minnesota have all looked at what happens immediately surrounding new large-scale apartments that are market-rate (no rent restrictions). Many studies already show that regions that build more are more affordable (and regions that restrict new housing are less so). These latest studies ask if that pattern holds when we zoom in to individual blocks.

Taken together, the new findings suggest that new housing can ease rising rents in other buildings close by. But their verdict is mixed on whether lower-income renters directly benefit from new supply, too.

The kinds of buildings these studies describe — market-rate developments of 50 units or more — now account for a majority of new apartment construction. And new apartments today overwhelmingly target higher-income renters. The median rent for a new unit is now $1,620 a month, 78 percent higher than the median rent nationwide, according to the Harvard Joint Center for Housing Studies (the gulf between those figures has been widening).

These buildings also tend to be the most visible in neighborhood housing fights.

"Renters don't like new high-



STEFANO UKMAR FOR THE NEW YORK TIMES
Residents of Two Bridges on the Lower East Side slowed a developer's plan to build three residential skyscrapers to join One Manhattan Square, above.

rises because they see new high-rises and rents going up at the same time," said Xiaodi Li, a doctoral fellow at the N.Y.U. Furman Center who has studied the effect of new housing in New York City.

Neighbors may assume that the high-rises *cause* the high rents. That's plausible if new buildings attract much wealthier residents, who in turn attract higher-end amenities that make a neighborhood more desirable.

"The key question here," Ms. Li said, "is what's the net effect?"

She finds in New York that new buildings *do* attract more restaurants and cafes nearby. But she concludes that any effect those amenities have pushing up local rents is swamped by the power of new supply to push rents down. On net, she finds, for every 10 percent increase in housing supply, rents for properties within 500 feet drop by 1 percent, relative to other high-demand areas.

Those benefits appear to be going to tenants in high-end and midrange buildings nearby. Presumably, their landlords see new competition and adjust their own rents accordingly. But Ms. Li finds that new housing has no effect on rents more than 500 feet away, and it doesn't appear to affect rents for lower-end units nearby (those landlords probably don't see new luxury towers as direct competition).

In a separate study, Brian Asquith and Evan Mast at the Upjohn Institute and Davin Reed at the Philadelphia Fed find a similar set of results across 11 major cities, including Atlanta, Austin, Chicago and Denver. They look at new buildings of at least 50 units constructed in lower-income, central-city neighborhoods. They estimate that these new buildings decrease rents by 5 percent to 7 percent for their immediate neighbors, relative to what we'd expect rents to be if the new buildings were never built.

Neither study means that rents actually fall. Rather, they suggest that new buildings slow the pace of rent increases in the kinds of neighborhoods that developers have already identified as hot. By the time those developers arrive — particularly with plans for large-scale projects — rents are most likely already rising rapidly.

"Wealthy people are already looking to move into the neighborhood," Mr. Mast said of how he would explain his findings to a heated public meeting over such a proposal. "So we can build this building that will give them the sort of unit that they want to live in. Or if we don't, they'll take a unit nearby and renovate it."

That logic may be little comfort to longtime residents, particularly those concerned about neighborhood changes that go beyond rent prices. But it addresses at least one argument against new housing.

"These results don't deny the reality of gentrification," said Ingrid Gould Ellen, a professor at N.Y.U. and an adviser to Ms. Li. "They don't deny the reality of crushing rent burdens. They simply suggest that building more housing in a neighborhood isn't going to exacerbate those high rent burdens and may even help to alleviate them."

One caution comes from research by Anthony Damiano and Chris Frenier, doctoral candidates at the University of Minnesota who looked at new large-scale buildings built across Minneapolis. Like Mr. Mast and Ms. Li, they find that new supply helped ease rent pressure for higher-end units nearby. But at the bottom third of the market, they concluded that new buildings had the opposite effect, accelerating rents.

It's possible in some contexts that new market-rate apartments could cause one set of nearby landlords to curb their rents even as it causes another set to reassess how cheap their rents have been. It's even possible that lower-income renters may feel a bite from new construction at first, even if they may benefit from it over the long run (as new buildings age and become more affordable, or as higher-income renters move up and out of housing that could be affordable to poorer tenants).

Collectively, there is evidence in these papers that supply and demand work as economists expect, even at the neighborhood scale. But there's also evidence that some fears of poorer tenants are founded.

"These are folks that have gone through how many cycles of urban renewal, freeway construction, public housing disinvestment, failures by the broader planning and government establishment over generations," Mr. Damiano said. "I think the fear of just saying 'build baby build' is a very valid fear. It's up to planners and policymakers to engage those concerns in good faith."