## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re | ) | Chapter 11 |
|  | ) |  |
| TOUGH MUDDER INC., *et al.*,[1] | ) | Case No. 20-10036 (CSS) |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |
|  | ) | **Re: D.I. 30** |

### ORDER (I) APPROVING THE ASSET PURCHASE AGREEMENT BY AND AMONG SPARTAN RACE, INC., AND DEBTORS' CHAPTER 11 TRUSTEE, (II) AUTHORIZING THE PRIVATE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, (III) APPROVING THE ASSUMPTION AND ASSIGNMENT OF ASSUMED EVENTS AND CONTRACTS, AND (IV) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of Derek C. Abbott, in his capacity as the duly appointed Chapter 11 Trustee (the "Trustee") for Tough Mudder, Inc. ("Tough Mudder"), and Tough Mudder Event Production Incorporated (together, the "Debtors"), for entry of an order (this "Order") (i) approving that certain Asset Purchase Agreement, dated as of February 7, 2020, by and among Spartan Race, Inc. or its designee, which designee is OCR US Holdings, LLC ("Buyer") and the Trustee for the benefit of the Debtors, attached hereto as **Exhibit A** and incorporated herein by reference (the "Sale Agreement"); (ii) authorizing and approving the sale of the Acquired Assets to Buyer, free and clear of all Encumbrances, (iii) approving the assumption and assignment of the Assumed Events and Contracts to the Buyer in connection with the Sale and related procedures provided in the Motion; (iv) approving certain Bid

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tough Mudder Inc. (2576) and Tough Mudder Event Production Inc. (6845). The Debtors' address is 15 MetroTech Center, Brooklyn, NY 12201.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion or the Sale Agreement.

Protections; and (v) granting related relief, all as more fully set forth in the Motion; and the Court having held the Sale Hearing on February 25, 2020, and the Court having determined that the relief requested in the Motion is in the best interest of the Debtors' estates, the Debtors' creditors, and other parties in interest; and after due deliberation thereon; and good and sufficient cause having been shown for the relief requested; and adequate notice having been given under the circumstances;

NOW, upon the Motion, the related documents, the record created and the statements of counsel advanced at the Sale Hearing,

THE COURT HEREBY FINDS THAT:

A.      The Court has jurisdiction to hear and determine the Motion pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(a) and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated as of February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O).  Venue is proper in this district and in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.      This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Order, and expressly directs entry of judgment as set forth herein.

C.      The findings of fact and conclusions of law set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

D.      The Trustee is duly authorized to sell or otherwise transfer the Debtors' assets in these bankruptcy cases.  The Trustee has demonstrated good, sufficient, and sound business purposes and justification for approval of the Motion and the approval of and entry into the Sale Agreement and any ancillary agreements thereto, and the sale to Buyer pursuant to the Sale Agreement (the "Sale") (i) is the result of due deliberation by the Trustee and constitutes a sound and reasonable exercise of the Trustee's business judgment consistent with his duties; (ii) provides value and is beneficial to the Debtors' estates, and is in the best interests of the Debtors, their estates and their stakeholders; and (iii) is reasonable and appropriate under the circumstances.  Business justifications for entry into the Sale and the Sale Agreement include, without limitation, (a) the Sale Agreement constitutes the highest or otherwise best offer received for the Acquired Assets; (b) the Sale Agreement presents the best opportunity to maximize the value of the Acquired Assets and to avoid decline and devaluation as a result of delay or liquidation; (c) failure to consummate the Sale expeditiously, as provided under the Sale Agreement, could materially diminish creditor recoveries or the prospect of creditor recoveries; and (d) the immediate consummation of the Sale is necessary to maximize the value of the Debtors' estates.. Given the Debtors' prior marketing of the Acquired Assets by Imperial Capital and the significant threat of immediate wasting of the Acquired Assets, the Sale contemplated pursuant to the Sale Agreement presents the best opportunity to maximize value of the Debtors' assets and will provide a greater recovery for the Debtors' estates and their creditors than would be provided through any presently available alternative.

E.      The Trustee, the Buyer, and their respective counsel and other advisors have negotiated and entered into the Sale Agreement and each of the transactions contemplated thereby, including the payment of the Bid Protections payable only if an Alternative Transaction

closes, in good faith, without collusion and from arm's-length bargaining positions. The Trustee was free to deal with any other party interested in acquiring all or some of the Acquired Assets. The sale process engaged in by the Trustee and the negotiation of the Sale Agreement with the Buyer was at arm's length, non-collusive, in good faith, and substantively and procedurally fair to all parties. Neither the Debtors, the Trustee nor the Buyer has engaged in any conduct that would cause or permit the Sale Agreement or the Sale contemplated thereby to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code. The Buyer is a good-faith purchaser and is acting in good faith within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby.

F.      The conditions of section 363(f) of the Bankruptcy Code have been satisfied with respect to any and all persons or entities, if any, asserting any lien, pledge, security interest, charge, option, claim, encumbrance, or other interest of any nature or extent (each, an "Interest") on the Debtors' assets. Those holders of Interests who did not object to the Motion, who withdrew their objections to the Motion, or whose objections are otherwise resolved by this Order, are deemed to have consented to the relief sought in the Motion pursuant to section 363(f)(2) of the Bankruptcy Code.

G.      The Trustee has given due and proper notice of the Sale contemplated by the Motion to all parties required to receive notice, in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules of this Court. The form, scope and manner of notice and service were proper, timely, adequate, and sufficient in accordance with sections 105, 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6007, and 9014. A reasonable opportunity to object or be heard with respect to the Motion and the relief requested therein has been afforded to creditors, Non-Debtor Counterparties, and interested parties. The objections to

the Motion filed by Navy Federal Credit Union [D.I. 59], Storm Events, LLC [D.I. 58], Old

Bridge Township Raceway Park, Inc. [D.I. 60], and OpenFit, LLC [D.I. 69] have been overruled,

withdrawn, or resolved by agreement of the parties as set forth in this Order.

      H.     In order to maximize the value of the Debtors' assets, it is essential that the Sale

occur on an expedited basis.  Accordingly, the Court finds that there is cause to waive and/or

vacate the stays imposed by Bankruptcy Rules 6004(h) and 6006(d), and such stays are hereby

vacated and shall have no application to the relief afforded by this Order.

      I.     The Buyer is not an "insider" of the Debtors, as that term is defined in section

101(31) of the Bankruptcy Code.

      J.     The Sale Agreement was not entered into for the purpose of hindering, delaying,

or defrauding creditors under the Bankruptcy Code or under the laws of the United States or any

state (including, without limitation, the Uniform Fraudulent Conveyance Act and the Uniform

Fraudulent Transfer Act).   The consideration provided by the Buyer pursuant to the Sale

Agreement is fair and adequate and constitutes reasonably equivalent value and fair

consideration under the Bankruptcy Code and under the laws of the United States or any state

(including, without limitation, the Uniform Fraudulent Conveyance Act and the Uniform

Fraudulent Transfer Act).

      K.     The Buyer is not a successor to either of the Debtors or their estates by reason of

any theory of law or equity, and neither the Buyer nor any of its affiliates shall assume or in any

way be responsible for any liability or obligation of the Debtors or their respective estates, except

as otherwise expressly provided in the Sale Agreement.  Upon the closing of the Sale, the Buyer

shall not be deemed to (i) be the successor of or successor employer to the Debtors and, to the

extent any of the Debtors' prior employees become employees of the Buyer, then the Buyer shall

instead be, and be deemed to be, a new employer with respect to any and all federal or state laws, including unemployment laws; (iii) have, *de facto*, or otherwise, merged or consolidated with or into the Debtors; (iv) be a mere continuation or substantial continuation of the Debtors or the enterprise(s) of the Debtors; or (v) be liable for any acts or omissions of the Debtors in the conduct of their business or arising under or related to the Acquired Assets other than Assumed Liabilities. Without limiting the generality of the foregoing, and except as otherwise provided in the Sale Agreement, the parties intend that Buyer shall have no successor or vicarious liability of any kind or character whatsoever, whether known or unknown as of the closing of the Sale, whether now existing or hereafter arising, whether asserted or unasserted, or whether fixed or contingent, with respect to the Debtors' business, the Acquired Assets, or any and all pledges, options, charges, liabilities, liens, claims, encumbrances, or Interests (other than the Assumed Liabilities) of the Debtors arising prior to the closing of the Sale.  The Buyer would not have acquired the Acquired Assets but for the foregoing protections against potential claims based upon "successor liability" theories.

L.    The Trustee and the Buyer have full corporate power and authority to execute and deliver the Sale Agreement and all other documents contemplated thereby, and no further consents or approvals are required for the Trustee or the Buyer to consummate the transactions contemplated by the Sale Agreement, except as otherwise set forth in the Sale Agreement.

M.    The Trustee has met all requirements of section 365(b) of the Bankruptcy Code with respect to the assumption and assignment of each of the Assumed Events and Contracts. The Trustee and Buyer have provided adequate assurance (within the meaning of section 365(b)(1) of the Bankruptcy Code) of cure of any default existing under any of the Assumed Events and Contracts on or before the Closing Date.  The assumption and assignment of the

Assumed Events and Contracts pursuant to the terms of the Sale Agreement is in the best interests of the Debtors and their estates, creditors, interest holders and other parties in interest, and represents the reasonable exercise of sound and prudent business judgment by the Trustee. As of the closing, each Assumed Event and Contract will be in full force and effect against the non-Debtor party thereto in accordance with the terms of such Assumed Event or Contract. The Buyer has demonstrated adequate assurance of future performance of and under the Assumed Events and Contracts within the meaning of sections 365(b)(1)(C), 365(f)(2)(B) and 365(b)(3) (to the extent applicable) of the Bankruptcy Code.

N.      To maximize the value of the Debtors' assets, it is essential that the Sale of the Acquired Assets occur within the time constraints set forth in the Sale Agreement.     The consummation of the Sale is necessary both to preserve and maximize the value of the Debtors' assets for the benefit of the Debtors, their estates, their creditors, interest holders and all other parties in interest in the Chapter 11 Cases, and to provide the means for the Debtors to maximize creditor recoveries.

O.      The consummation of the Sale is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363 and 365, and all of the applicable requirements of such sections have been complied with in respect of the Sale.

P.      The Debtors' published policy in connection with offering products or services does not prohibit the transfer of personally identifiable information and therefore, the sale of the Acquired Assets may be approved pursuant to section 363(b)(1) of the Bankruptcy Code without the appointment of a consumer privacy ombudsman, as defined in section 332 of the Bankruptcy Code.

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED THAT:

1.      The Motion is hereby granted, and the proposed sale of Acquired Assets and assumption and assignment of the Assumed Events and Contracts to the Buyer upon the terms and conditions set forth in the Sale Agreement is hereby approved in all respects.

2.      All objections with regard to the relief sought in the Motion that have not been withdrawn, waived, or settled, are hereby overruled on the merits.

3.      The Asset Purchase Agreement and all transactions contemplated thereby, including the payment of the Bid Protections to the extent an Alternative Transaction closes, are hereby approved in all respects.

4.      Pursuant to sections 105 and 363(f) of the Bankruptcy Code, upon consummation of the Sale, the Acquired Assets shall be transferred to Buyer.  Upon such transfer, the Buyer shall be vested with all right, title and interest of the Debtors in and to the Acquired Assets free and clear of any and all Encumbrances, which Encumbrances, if any, shall attach to the proceeds of the Sale, with the same validity, extent, and priority, and subject to the same defenses (including, without limitation, any defenses under chapter 5 of the Bankruptcy Code), as had attached to such asset immediately prior to the sale.

5.      The Trustee is hereby authorized to enter into and perform his obligations under the Sale Agreement, and to take such other actions as may be necessary or desirable to effectuate the terms of the Sale Agreement and other instruments or documents that may be reasonably necessary or desirable to implement and effectuate the terms of the Sale Agreement, the Sale or this Order, including, without limitation, deeds, assignments, stock powers, transfers of membership interests and any other instruments of transfer, without further order of the Court. The Trustee is hereby further authorized to take all other actions as may reasonably be requested

by the Buyer or otherwise for the purpose of assigning, transferring, granting, conveying and

conferring to the Buyer, or reducing to the Buyer's possession any or all of the Acquired Assets,

including the Assumed Events and Contracts, as may be necessary or appropriate for the Trustee

to perform his obligations under the Sale Agreement and consummate the Sale, without further

order of the Court.

6.      The automatic stay imposed under section 362 is modified solely to the extent

necessary to implement the Sale Agreement.

7.      This Order is and shall be effective as a determination that all claims,

Encumbrances, Liabilities and interests shall be, and are, without further action by any person or

entity, released with respect to the Acquired Assets, the Assumed Contracts, or Assumed Events

as of the Closing Date.

8.      Under sections 105(a), 363 and 365 of the Bankruptcy Code, and subject to and

conditioned upon the closing of the Sale, the Trustee's assumption and assignment of the

Assumed Events and Contracts to the Buyer free and clear of all liens pursuant to the procedures

set forth in the Motion and the terms of the Sale Agreement, as modified by the terms of any

amendments reached by the Buyer and the respective Non-Debtor Counterparty, is hereby

approved, and the requirements of sections 365(b)(1), 365(f)(2) and 365(b)(3) (to the extent

applicable) of the Bankruptcy Code with respect thereto are hereby deemed satisfied.  Upon the

Trustee's assumption and assignment of the Assumed Events and Contracts to the Buyer, each

applicable Non-Debtor Counterparty shall be forever barred, estopped and permanently enjoined

from raising or asserting against the Debtors, the Trustee, the Buyer or their respective property,

any assignment fee, default, breach, claim, pecuniary loss, liability or obligation (whether legal

or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, known

or unknown, liquidated or unliquidated senior or subordinate), counterclaim, defense, setoff or any other matter arising under or out of, in connection with or in any way related to, the Assumed Events and Contracts existing as of the Closing Date or arising by reason of the Closing. Upon the Trustee's assumption and assignment of the Assumed Events and Contracts to the Buyer, the Buyer shall be fully and irrevocably vested with all right, tile and interest of the Debtors in and to the Assumed Events and Contracts and, pursuant to section 365(k) of the Bankruptcy Code, the Debtors and the Trustee shall be relieved from any further liability with respect to the Assumed Events and Contracts. The Trustee's assumption and assignment of the Assumed Events and Contracts to the Buyer shall not constitute a default under or a termination of any Assumed Event or Contract.

9.      Following the execution of the Sale Agreement, Schedules 1.1.10 and 1.1.11 to the Sale Agreement have been updated to resolve both filed objections, as well as the informal responses to the Motion asserted by vendors Materialogic, Wondersauce, and Event Medic. Attached hereto as **Exhibit B** are amended and restated Schedule 1.1.10 – Assumed Contracts and Schedule 1.1.11 – Assumed Events to the Sale Agreement.

10.      With respect to that certain sponsorship agreement, dated January 30, 2019, by and between Navy Federal Credit Union ("Navy Federal") and Tough Mudder (as amended from time to time) (the "Navy Agreement"),[3] the Objection filed by Navy Federal [D.I. 59] is hereby resolved by the parties as follows: (i) the Navy Agreement shall be listed as an Assumed Contract on Schedule 1.1.10 and state the Cure Amount as $0; (ii) the Parties agree to modify the Navy Agreement to confirm that: (a) the six (6) events listed on the Assumed Events Schedule included in the proposed Order on the Motion shall be deemed the "Events" for the Second

---

[3] Capitalized terms used in this paragraph but not otherwise defined shall have the meaning ascribed to such terms as in the Navy Agreement.

Contract Year (in year 2020); (b) any additional events scheduled by Buyer during the Second Contract Year shall be included as "Events" under the Navy Agreement; and (c) the Parties agree to continue good faith negotiations to include other sponsorship opportunities for 2020 with Buyer or its affiliate Spartan Race, Inc. In consideration of the foregoing, Navy Federal waives any defaults, claims, causes of action, damages or defenses against Buyer based on the number of Events held in the Territory during the Second Contract Year.

11.     The objection of OpenFit, LLC ("OpenFit") [D.I. 69] has been withdrawn, and notwithstanding anything to the contrary in this Order, OpenFit, the Debtors, and the Trustee, retain all rights and interests under the Bankruptcy Code, applicable non-bankruptcy law, and that certain Development, Distribution and Marketing Agreement, dated as of August 17, 2018 (the "Distribution Agreement"), between Tough Mudder and OpenFit, including the right to assert or contest any asserted rights or interests arising under the Distribution Agreement. For the avoidance of doubt, nothing in this Order is or shall be interpreted to expand, diminish or impair any rights OpenFit may have under the Distribution Agreement.

12.     The Buyer has provided adequate assurance of future performance under the Assumed Events and Contracts within the meaning of sections 365(b)(1)(C), 365(f)(2)(B) and 365(b)(3) (to the extent applicable) of the Bankruptcy Code.

13.     With respect to that certain "Event Agreement" dated as of January 5, 2017, as amended by that certain "Tough Mudder Storm Events Agreement Amendment" dated as of September 30, 2019, by and between Storm Events, LLC and Tough Mudder, the objection by Storm Events, LLC [D.I. 58] is hereby resolved by the parties as follows: (i) the Buyer has provided adequate assurance of future performance through the payment of the Cure Amount on or about the Closing Date in the sum of $18,330.43 and acceptance of the obligation to make

payment of $10,000.00 on or before April 1, 2020 on account of the deposit for the November 2020 event; and (ii) Schedule 1.1.11 shall be amended with the updated Cure Amount and the correct counterparty name.

14.    With respect to that certain "Venue Agreement," dated November 1, 2018, by and between Old Bridge Township Raceway Park, Inc. ("Raceway Park") and Tough Mudder, as subsequently amended and modified, the objection by Raceway Park [D.I. 60] is hereby resolved by the parties as follows: (i) Section 1.1. of Venue Agreement is hereby revised to delete the words "Spartan Race;" (ii) Buyer shall pay the Cure Amount in the sum of $108,181.12 on or about the Closing Date and Schedule 1.1.11 shall be deemed amended with the updated Cure Amount due Raceway Park; (iii) the Venue Agreement shall be assumed and assigned among the Assumed Events upon payment of the foregoing Cure Amount and (iv) the foregoing Cure Amount shall not include amounts that accrue *and/or come due* after the date of this Order.

15.    The payment of the applicable Cure Amounts, if any, by the Buyer as required by the Sale Agreement shall (a) effect a cure of all defaults existing thereunder as of the Closing Date, (b) compensate for any actual pecuniary loss to such Non-Debtor Counterparty resulting from such default, and (c) together with the assignment by the Trustee to and the assumption of the Assumed Events and Contracts by the Buyer, constitute adequate assurance of future performance thereof.  The requirements of sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code are hereby deemed satisfied with respect to the Assumed Events and Contracts.  Upon the payment of the applicable Cure Amount, if any, by the Buyer, the Assumed Contracts will remain in full force and effect, and no default shall exist under the Assumed Contracts nor shall there exist any event or condition which, with the passage of time or giving of notice, or both, would constitute such a default.

16.    Any provision in any Assumed Event or Contract that prohibits or conditions the assignment of such Assumed Event or Contract or allows the party to such Assumed Event or Contract to terminate, recapture, impose any penalty, condition on renewal or extension or modify any term or condition upon the assignment of such Assumed Event or Contract, constitute unenforceable anti-assignment provisions that are void and of no force and effect. All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Trustee and assignment to the Buyer of the Assumed Events and Contracts have been satisfied. Upon the closing, in accordance with sections 363 and 365 of the Bankruptcy Code, the Buyer shall be fully and irrevocably vested with all right, title and interest of the Debtors under the Assumed Events and Contracts.

17.    All Non-Debtor Counterparties to Assumed Events and Contracts assigned to the Buyer in accordance with the terms of this Order and the Sale Agreement shall cooperate with, and execute and deliver upon, any reasonable request of the Buyer for any instruments, applications, consents or other documents that may be required or requested by any governmental unit or other public or quasi-public authority or other party to effectuate the applicable transfers in connection with the Trustee's assumption and assignment of the Assumed Events and Contracts to the Purchaser.

18.    The findings of fact set forth above and conclusions of law set forth herein shall constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014, and the fact that the findings of fact and conclusions of law set forth herein are not in a separate document shall not affect the relief granted herein, this Order's binding effect, or the right of any party to appeal this Order or the time within which an appeal may be taken. To the extent any findings of fact

constitute conclusions of law, they are adopted as such. To the extent any conclusions of law constitute findings of fact, they are adopted as such.

19.     Except as expressly permitted by this Order, or as expressly assumed pursuant to the Sale Agreement, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax and regulatory authorities, parties to executory contracts, customers, lenders, trade and other creditors, holding or asserting any claim of any kind or nature with respect to, arising under or out of, in connection with, or in any way relating to, the Debtors, any asset sold pursuant to this Order, the operation of the Debtors' business, shall be, and hereby are forever barred, estopped and permanently enjoined from asserting such claim against the Buyer, its successors and assigns, or the Acquired Assets. The entry of this Order and consequent approval of the Sale Agreement shall mean that Buyer shall not be deemed to (i) be the successor of (under any state, territorial, or federal law) or successor employer to the Debtors and shall instead be, and be deemed to be, a new employer with respect to any and all federal or state unemployment laws; (iii) have, *de facto*, or otherwise, merged or consolidated with or into the Debtors; (iv) be a mere continuation or substantial continuation of the Debtors or the enterprise(s) of the Debtors; or (v) be liable for any acts or omissions of the Debtors in the conduct of their business or arising under or related to the Acquired Assets other than as set forth in the Sale Agreement and this Order. Without limiting the generality of the foregoing, the Buyer shall not be liable for any liability (other than the Assumed Liabilities) against any Debtor, or any of its predecessors or affiliates, and Buyer shall have no successor or vicarious liability of any kind or character whatsoever with respect to the Acquired Assets. Buyer would not have acquired the Acquired Assets but for the foregoing protections against potential claims based upon "successor liability" theories.

20.     This Order shall be binding upon and shall govern the acts of all entities, including without limitation all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to certify, report or insure any title or state of title in or to any of the Acquired Assets. Each and every federal, state, and local governmental agency or department is hereby authorized to accept for filing and/or recording, and approve as necessary, any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Sale Agreement.

21.     The Trustee and the Buyer entered into the Sale Agreement in good faith, and Buyer is a good faith buyer as that term is used in section 363(m) of the Bankruptcy Code. The Buyer is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code. Accordingly, the reversal or modification of the authorization provided herein to consummate the transactions contemplated herein shall not affect the validity of the Sale to Buyer, unless such authorization is duly stayed.

22.     The consideration to be provided by Buyer for the Acquired Assets and the Assumed Events and Contracts under the Sale Agreement, including the assumption of the Assumed Liabilities, is fair and reasonable for such assets, and constitutes "value" for the purposes of section 363(m) of the Bankruptcy Code, and the Sale may not be avoided under section 363(n) of the Bankruptcy Code.

23.     Nothing contained in any order of any type or kind entered in (i) these Chapter 11 Cases, (ii) any subsequent chapter 7 case into which any such Chapter 11 Case may be converted, or (iii) any related proceeding subsequent to entry of this Order, shall conflict with or derogate from the provisions of the Sale Agreement or the terms of this Order.

24.     No bulk sales law, or similar law of any state or other jurisdiction shall apply in any way to the transactions contemplated by the Sale Agreement or this Order.

25.     The failure specifically to include any particular provision of the Sale Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Sale Agreement be authorized and approved in its entirety.

26.     The Sale Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the Parties and in accordance with the terms thereof, without further order of the Court.

27.     The provisions of Bankruptcy Rules 6004(h) and 6006(d) staying the effectiveness of this Order, to the extent applicable, are hereby waived and this Order shall be effective, and the parties may consummate the transactions contemplated by the Motion, immediately upon entry.

28.     This Court shall retain jurisdiction with respect to any matters related to or arising under this Order.

29.     This Order constitutes a final order for purposes of Bankruptcy Rules 5003 and 9021.

Dated: February 25, 2020
            Wilmington, Delaware

THE HONORABLE CHRISTOPHER S. SONTCHI
CHIEF UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT A**

*Execution Copy*

# ASSET PURCHASE AGREEMENT

**SPARTAN RACE, INC.,**
**a Delaware corporation**

**as Buyer,**

**AND**

**DEREK C. ABBOTT, NOT INDIVIDUALLY, BUT SOLELY IN HIS CAPACITY AS**
**CHAPTER 11 TRUSTEE OF THE BANKRUPTCY ESTATE OF TOUGH MUDDER,**
**INCORPORATED AND TOUGH MUDDER EVENT PRODUCTION INCORPORATED,**

**as Seller**

**Dated as of February 7, 2020**

**TABLE OF CONTENTS**

<u>Page</u>

1.    Definitions..................................................................................................................1
    1.1    Defined Terms ....................................................................................................1
    1.2    Interpretation......................................................................................................7
2.    Transfer of Assets ......................................................................................................7
    2.1    Purchase and Sale of Assets...............................................................................7
    2.2    Excluded Assets .................................................................................................8
    2.3    Instruments of Transfer ...................................................................................10
3.    Consideration ...........................................................................................................10
    3.1    Purchase Price...................................................................................................10
    3.2    Cure Claims ......................................................................................................11
    3.3    Excluded Liabilities .........................................................................................11
    3.4    Allocation of the Purchase Price......................................................................11
    3.5    Consumer Privacy ............................................................................................11
4.    Closing Transactions................................................................................................11
    4.1    Closing ..............................................................................................................11
    4.2    Closing Date......................................................................................................11
    4.3    Seller's Deliveries to Buyer at Closing............................................................12
    4.4    Buyer's Deliveries to Seller at Closing............................................................12
    4.5    Sales, Use, and Other Taxes ............................................................................13
    4.6    Possession .........................................................................................................13
5.    Conditions Precedent to Closing..............................................................................13
    5.1    Conditions to Seller's Obligations ..................................................................13
    5.2    Conditions to Buyer's Obligations...................................................................13
    5.3    Frustration of Closing Conditions....................................................................14
6.    Termination...............................................................................................................14
    6.1    Means of Termination.......................................................................................14
    6.2    Procedure Upon Termination............................................................................15
    6.3    Effect of Termination .......................................................................................15
7.    Seller's Representations and Warranties ..................................................................15
    7.1    Organization and Qualification.........................................................................15
    7.2    Due Authorization.............................................................................................15

| | | |
|---|---|---|
| 7.3 | Conflict with Other Instruments; Absence of Restrictions | 15 |
| 7.4 | Title to the Acquired Assets | 15 |
| 7.5 | No Other Representations and Warranties | 15 |
| 8. | Buyer's Representations and Warranties | 16 |
| 8.1 | Validity of Agreement | 16 |
| 8.2 | Organization, Standing and Power | 16 |
| 8.3 | No Conflicts or Violations | 16 |
| 8.4 | Ability to Close and Perform | 16 |
| 8.5 | Brokers' Fees | 17 |
| 9. | "As Is" Transaction | 17 |
| 10. | Conduct and Transactions Prior to Closing | 17 |
| 10.1 | Access to Records and Properties of the Debtor | 17 |
| 10.2 | Bankruptcy Court Matters | 18 |
| 11. | Miscellaneous | 19 |
| 11.1 | Reasonable Access to Records | 19 |
| 11.2 | Notices | 19 |

## SCHEDULES

| Name | Schedule |
|---|---|
| Assumed Contracts | 1.1.10 |
| Assumed Events | 1.1.11 |
| Intellectual Property Assets | 2.1.6 |
| Tangible Personal Property | 2.1.7 |

## EXHIBITS

| | |
|---|---|
| Exhibit A | Bill of Sale |
| Exhibit B | Assumption and Assignment Agreement |
| Exhibit C | IP Assignment and Assumption Agreement |

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (the "Agreement") is made and entered into as of this 5th day of February, 2020 (the "Effective Date"), by and among Spartan Race, Inc. or its designee (the "Buyer") and Derek C. Abbott, not individually, but solely in his capacity as chapter 11 trustee (the "Trustee" or "Seller") of the bankruptcy estate of Tough Mudder Incorporated and Tough Mudder Event Production Incorporated (together, the "Debtor").

### RECITALS

A.      On January 7, 2020 (the "Filing Date"), an involuntary chapter 11 case was filed by petitioning creditors, Valley Builders LLC, Trademarc Associates Inc., and David Watkins Homes Inc. (the "Bankruptcy Case") under title 11 of the United States Code (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

B.      On January 21, 2020, the Court entered an *Order for Relief in Involuntary Case* [Dkt. No. 19] and entered an *Order Directing the Appointment of a Chapter 11 Trustee* [Dkt. No. 18]. Thereafter, on January 30, 2020, the Court entered an *Order Approving the Appointment of Derek C. Abbott, Esq. as Chapter 11 Trustee* [Dkt. No. 24].

C.      Seller desires to sell to Buyer, and Buyer desires to purchase from Seller, the Acquired Assets (as defined herein), and Buyer desires to assume the Assumed Liabilities (as defined herein) in connection therewith, upon the terms and conditions set forth in this Agreement and in accordance with §§ 105, 363, and 365 and other applicable provisions of the Bankruptcy Code.

D.      The execution and delivery of this Agreement and Seller's ability to consummate the transactions set forth in this Agreement are subject, among other things, to the entry of the Sale Order (as defined below).

### AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, Buyer and Seller hereby agree as follows:

1.      Definitions.

1.1      Defined Terms. As used in this Agreement, terms defined in the preamble, recitals and other sections of this Agreement shall have the meaning set forth therein, and the following terms shall have the meaning herein specified, unless the context otherwise requires:

1.1.1      "2020 Tough Mudder Season Pass" means a season pass that provides the owner with registration to every 5k and "Tough Mudder Classic" in the United States for the 2020 calendar year.

1.1.2      "Active" means Active Networks, LLC.

1.1.3     "Acquired Assets" has the meaning set forth in Section 2.1.

1.1.4     "Affiliate" when used with reference to another Person means any Person, directly or indirectly, through one or more intermediaries, Controlling, Controlled by, or under common Control with, such other Person.

1.1.5     "Agreement" has the meaning set forth in the Preamble.

1.1.6     "Allocable Consideration" has the meaning set forth in Section 3.4.

1.1.7     "Allocation Schedule" has the meaning set forth in Section 3.4.

1.1.8     "Alternative Transaction" means a transaction or series of related transactions pursuant to which Seller accepts a bid for all or a material portion of the Acquired Assets or any group of assets that includes all or a material portion of the Acquired Assets, from a Person other than Buyer or any Affiliate of Buyer (or a group or joint venture that includes Buyer or any Affiliate of Buyer), as the highest or otherwise best offer, in accordance with the Sale Motion.

1.1.9     "Assignment and Assumption Agreement" has the meaning set forth in Section 4.3.6.

1.1.10     "Assumed Contracts" means the Contracts listed on Schedule 1.1.10, individually or collectively as the context requires.

1.1.11     "Assumed Events" means the Tough Mudder offered 2020 events identified on Schedule 1.1.11.

1.1.12     "Assumed Liabilities" means the following Liabilities of Seller: (i) Seller's obligations to natural persons holding event registrations associated with an Assumed Event, (ii) for each of the Excluded Events, Buyer will exchange any natural person's event registration for two comparable Buyer event registrations to occur on or before December 31, 2021, (iii) for every 2020 Tough Mudder Season Pass held by a natural person, Buyer will exchange their 2020 Tough Mudder Season Pass for two consecutive years (i.e., 2020-2021) of a comparable Buyer season pass, (iv) all Liabilities of Seller under each Assumed Contract, in each case, arising after the Closing (v) all Cure Claims, (vi) all Liabilities arising out of Buyer's use of the Acquired Assets by Buyer after the Closing to the extent such Liabilities arise solely out of any matter, occurrence, action, omission or circumstance that first occurred or existed after the Closing.

1.1.13     "Bankruptcy Case" has the meaning set forth in the Recitals.

1.1.14     "Bankruptcy Code" has the meaning set forth in the Recitals.

1.1.15     "Bankruptcy Court" has the meaning set forth in the Recitals.

1.1.16     "Bill of Sale" has the meaning set forth in Section 4.3.4.

2

1.1.17    "Business Day" means a day other than Saturday, Sunday, or any day on which banks in Wilmington, Delaware are permitted or required to be closed.

1.1.18    "Buyer" has the meaning set forth in the Recitals.

1.1.19    "Cash Payment" has the meaning set forth in Section 3.1.1.

1.1.20    "Closing" has the meaning set forth in Section 4.1.

1.1.21    "Closing Date" has the meaning set forth in Section 4.2.

1.1.22    "Consent" means any approval, consent, ratification, permission, clearance, designation, qualification, waiver, or authorization, or an order of the Bankruptcy Court that deems or renders unnecessary the same.

1.1.23    "Contracts" means, with respect to any Person, any indentures, contracts, leases, options, agreements, instruments, licenses, undertakings, and other commitments, whether written or oral, to which such Person or such Person's properties are bound.

1.1.24    "Control" means, when used with reference to any Person, the power to direct the management or policies of such Person, directly or indirectly, by or through stock or other equity ownership, agency or otherwise, or pursuant to or in connection with any Contract; and the terms "Controlling" and "Controlled" shall have meanings correlative to the foregoing.

1.1.25    "Cure Claims" has the meaning set forth in Section 3.2.

1.1.26    "Default" means (a) a violation, breach, or default, (b) the occurrence of an event that, with the passage of time, the giving of notice or both, would constitute a violation, breach, or default, or (c) the occurrence of an event that, with or without the passage of time, the giving of notice or both, would give rise to a right of damages, specific performance, termination, cancellation, renegotiation, or acceleration (including the acceleration of payment).

1.1.27    "Deposit" has the meaning set forth in Section 3.1.2.

1.1.28    "Encumbrances" means any lien, encumbrance, claim (as defined in Section 101(5) of the Bankruptcy Code), right, demand, charge, mortgage, deed of trust, option, pledge, security interest or similar interest, title defect, hypothecation, easement, right of way, restrictive covenant, encroachment, right of first refusal, preemptive right, judgment, conditional sale or other title retention agreement, and all other impositions, imperfections, defects, limitations, or restrictions of any nature or kind whatsoever.

1.1.29    "Escrow" has the meaning set forth in Section 3.1.2.

1.1.30    "Escrow Holder" has the meaning set forth in Section 3.1.2.

3

1.1.31    "Excluded Assets" has the meaning set forth in Section 2.2.

1.1.32    "Excluded Events" has the meaning set forth in Section 2.2.2.

1.1.33    "Excluded Liabilities" means all Liabilities of Seller other than the Assumed Liabilities.

1.1.34    "Expense Reimbursement" means a reimbursement to Buyer not to exceed $50,000.00 of Buyer's actual reasonable documented out-of-pocket expenses incurred in connection with the transactions contemplated by this Agreement, including professional fees.

1.1.35    "Filing Date" has the meaning set forth in the Recitals.

1.1.36    "Governmental Authority" means any court, tribunal, arbitrator, authority, agency, commission, official or other instrumentality of the government of the United States or of any foreign country, any state or any political subdivision of any such government (whether state, provincial, county, city, municipal or otherwise).

1.1.37    "Independent Accounting Firm" has the meaning set forth in Section 3.4.

1.1.38    "Intellectual Property" means any and all rights, title, and interest in or relating to intellectual property of any type, which may exist or be created under the Laws of any jurisdiction throughout the world, including: (a) trademarks, service marks, trade dress, logos, slogans, trade names, service names, brand names, internet domain names, social media accounts, trademark applications, including but not limited to those set forth on Schedule 2.1.6 hereto, and all other source or business identifiers and general intangibles of a like nature, along with all applications, registrations, and renewals and extensions in connection therewith, and all goodwill associated with any of the foregoing; (b) patents and patent applications, together with all reissues, provisionals, continuations, continuations-in-part, divisionals, renewals, extensions, and reexaminations in connection therewith; (c) rights associated with works of authorship, including software, databases, websites, exclusive exploitation rights, mask work rights, copyrights, database, and design rights, whether or not registered or published, all registrations and recordations thereof and applications in connection therewith, along with all extensions and renewals thereof and all moral rights associated with any of the foregoing; (d) trade secrets, know-how, and other proprietary and confidential information, including inventions (whether or not patentable), invention disclosures, improvements, algorithms, source code, data analytics, methods, processes, designs, drawings, customer lists, supplier lists; together with all embodiments and fixations of any of the foregoing and all related documentation; (e) all third party intellectual property rights granted to Debtor in the form of use of likeness, image release, name, sobriquet, voice, actual and simulated likeness, biographical data, and any other form of personal identification.

1.1.39    "Intellectual Property Assets" has the meaning set forth in Section 2.1.8.

1.1.40    "IP Assignment Agreement" has the meaning set forth in Section 4.3.4.

4

1.1.41    "Laws" means all federal, state, local or foreign laws, statutes, common law, rules, codes, regulations, restrictions, ordinances, Orders, or other requirement or rule of law.

1.1.42    "Legal Proceeding" means any action, suit, arbitration, claim, or investigation by or before any Governmental Authority, any arbitration or alternative dispute resolution panel, or any other legal, administrative, or other proceeding.

1.1.43    "Liabilities" means any and all debts, losses, liabilities, claims (including "claims" as defined in the Bankruptcy Code), damages, fines, costs, royalties, warranties, proceedings, deficiencies, or obligations (including those arising out of any action or litigation, such as any settlement or compromise thereof or judgment or award therein) of any nature, whether known or unknown, absolute, accrued, contingent, or otherwise and whether due or to become due, and whether or not resulting from third-party claims, and any out-of-pocket costs and expenses (including attorneys', accountants', or other fees and expenses incurred in defending any action or litigation, in investigating any of the same, or in asserting rights hereunder).

1.1.44    "Order" means any judgment, order, writ, decree, injunction or other determination whatsoever of any Governmental Authority or any other entity or body whose finding, ruling or holding is legally binding or is enforceable as a matter of right (in any case, whether preliminary or final).

1.1.45    "Outside Date" has the meaning set forth in Section 4.2.

1.1.46    "Permits" means all material applications, notifications, licenses, permits, franchises, rights, certificates, approvals, consents, waivers, clearances, exemptions, classifications, registrations, orders, tariffs, rate schedules, and other similar documents and authorizations issued by any Person to the Debtor and used, or held for use, in connection with the Acquired Assets or applicable to ownership of the Acquired Assets, assumption of the Assumed Liabilities, or required under Law.

1.1.47    "Person" means any natural person, corporation, general partnership, limited partnership, limited liability company, proprietorship, joint venture, trust, association, union, entity, or other form of business organization or any Governmental Authority.

1.1.48    "Purchase Price" has the meaning set forth in Section 3.1.1.

1.1.49    "Records" means, with respect to the Debtor's business, the books, records, information, ledgers, files, invoices, documents, work papers, correspondence, lists (including customer lists, supplier lists and mailing lists), plans (whether written, electronic or in any other medium), drawings, designs, specifications, creative materials, advertising and promotional materials, marketing plans, studies, reports, data, metadata, and similar materials related to the Debtor's business and specifically excluding files and papers not otherwise relating to the conduct of the Debtor's business.

1.1.50    "Refund Event" has the meaning set forth in Section 3.1.2.

5

1.1.51    "Representative" of a Person means such Person's officers, directors, managers, employees, advisors, representatives (including its legal counsel and its accountants), and agents of such Person.

1.1.52    "Sale Motion" means that certain motion filed by the Seller in the Bankruptcy Case to seek authorization to consummate this Agreement with Buyer or to enter into an Alternative Transaction upon the terms and conditions set forth herein.

1.1.53    "Sale Order" has the meaning set forth in Section 10.2.2.

1.1.54    "Seller" has the meaning set forth in the Recitals.

1.1.55    "Seller's Knowledge" means with respect to any representation, warranty, or statement of Seller in this Agreement that is qualified by "Seller's Knowledge," the actual knowledge of the Debtor's former officer and consultant to the Trustee, Kyle McLaughlin.

1.1.56    "Taxes" means (a) any tax, charge, fee, levy, or other assessment including, any net income, gross income, gross receipts, sales, use, ad valorem, transfer, franchise, profits, payroll, employment, social security, withholding, unemployment, excise, estimated, stamp, occupancy, occupation, property or other similar taxes, including any interest or penalties thereon, and additions to tax or additional amounts imposed by any Governmental Authority or (b) any liability for the payment of any taxes, interest, penalty, addition to tax or like additional amount resulting from the application of Treasury Regulation §1.1502-6 or comparable Law.

1.1.57    "Tax Returns" means any declaration, return, report, estimate, information return, schedule, statements or other document filed or required to be filed with or, when none is required to be filed with a Governmental Authority, the statement or other document issued by, a Governmental Authority.

1.1.58    "Tough Mudder GmbH Receivables" means any and all interest held by the Seller in account receivables, loans, advances, and other amounts due the Seller from Tough Mudder GmbH.

1.1.59    "UK/Germany Ticket Claims" means any and all of the Seller's right, title and interest in any event registration sale and the proceeds therefrom arising on or after the Filing Date and relating to Tough Mudder events occurring in the United Kingdom or Germany.

1.1.60    "US Ticket Buyer Escrow" means that certain escrow account established by the Seller and Active to hold the proceeds of all post-Filing Date US Ticket Sales.

1.1.61    "US Ticket Buyer Escrow Proceeds" means the cash and cash equivalents of the Debtor's right, title and interest in US Ticket Sales and held in the US Ticket Buyer Escrow, minus 10% of such value to be retained by Seller for the benefit of the Debtor's estate.

6

1.1.62    "US Ticket Sales" means all post-Filing Date Tough Mudder event registrations for events held in the United States, and 2020 Tough Mudder Season Pass registrations, and all proceeds and product therefrom.

1.2    Interpretation.  When a reference is made in this Agreement to a section or article, such reference shall be to a section or article of this Agreement unless otherwise clearly indicated to the contrary.

1.2.1    Whenever the words "include," "includes" or "including" are used in this Agreement they shall be deemed to be followed by the words "without limitation."

1.2.2    The words "hereof," "herein" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole and not to any particular provision of this Agreement, and article, section, paragraph, exhibit and schedule references are to the articles, sections, paragraphs, exhibits and schedules of this Agreement unless otherwise specified.

1.2.3    The meaning assigned to each term defined herein shall be equally applicable to both the singular and the plural forms of such term.  Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

1.2.4    A reference to any party to this Agreement or any other agreement or document shall include such party's successors and permitted assigns.

1.2.5    A reference to any legislation or to any provision of any legislation shall include any amendment to, and any modification or reenactment thereof, any legislative provision substituted therefor and all regulations and statutory instruments issued thereunder or pursuant thereto.

1.2.6    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

1.2.7    Any reference in this Agreement to $ shall mean U.S. dollars.

1.2.8    The parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

2.    Transfer of Assets.

2.1    Purchase and Sale of Assets.  Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code and on the terms and subject to the conditions set forth in this Agreement and the Sale Order, at the Closing, Buyer shall purchase, acquire, and accept from Seller, and Seller

7

shall sell, transfer, assign, convey, and deliver to Buyer, all of Seller's right, title, and interest in and to the following assets (collectively, the "Acquired Assets"), free and clear of all Encumbrances, for the consideration specified in Section 3 (but excluding in each case, for the avoidance of doubt, any Excluded Asset):

2.1.1    all Assumed Contracts;

2.1.2    all Assumed Events;

2.1.3    the Tough Mudder GmbH Receivable;

2.1.4    the US Ticket Buyer Escrow and the US Ticket Buyer Escrow Proceeds;

2.1.5    the UK/Germany Ticket Claims;

2.1.6    all Intellectual Property, including but not limited to items set forth on Schedule 2.1.6, and any physical embodiments thereof, together with all claims, demands, income, damages, royalties, payments, accounts, and accounts receivable now or hereafter due and payable, and rights to causes of action and remedies, related to any of the foregoing, including without limitation, all proceeds to infringement suits, the right to sue and prosecute for past, present, and future infringement, misappropriation, or other violation of rights related to any of the foregoing (collectively, the "Intellectual Property Assets");

2.1.7    all tangible assets of Seller set forth on Schedule 2.1.7.

2.1.8    the amount of, and all rights to any, insurance proceeds received by Seller after the date hereof in respect of (i) the loss, destruction, or condemnation of any Acquired Assets, occurring prior to, on or after the Closing or (ii) any Assumed Liabilities;

2.1.9    Seller's Records related to the Acquired Assets other than any Records that are privileged communications; provided, however, that upon reasonable written request from Buyer, Seller shall enter into a common interest agreement with respect to such privileged materials to the extent that Seller can do so without waiving privilege; provided, further, that the Seller may not sell, transfer, lease or use any privileged communications related to the Acquired Assets in a manner that adversely affects the Buyer's interests in the Acquired Assets after the Closing;

2.1.10    all rights of Seller under non-disclosure or confidentiality agreements with the Buyer and other third parties, and any intellectual property assignments, to the extent relating to the Acquired Assets (or any portion thereof), excluding, however, all rights of Seller under any such agreement entered into in connection with the Bankruptcy Case;

2.2    Excluded Assets. Notwithstanding any provision in this Agreement to the contrary, other than the Acquired Assets, Buyer expressly acknowledges and agrees that it is not purchasing or acquiring, and Seller is not selling or assigning, any other assets or properties or claims or causes of action of Debtor or the Trustee, and all such other assets and properties shall be excluded from

8

the Acquired Assets (the "Excluded Assets"). Excluded Assets include, without limitation, all property or assets of every nature not expressly included in the Acquired Assets, including the following non-exhaustive list of assets and properties of Debtor:

        2.2.1      all cash and cash equivalents as of Closing (other than US Ticket Buyer Escrow Proceeds and the UK/Germany Ticket Claims);

        2.2.2      any agreements or interest of the Debtor relating to advertised or previously scheduled Tough Mudder events other than Assumed Events (the "Excluded Events");

        2.2.3      all of Seller's certificates of incorporation and other organizational documents, qualifications to conduct business as a foreign entity, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, stock certificates, and other documents relating to the organization, maintenance, and existence of Seller as a corporation;

        2.2.4      all Records related to Taxes paid or payable by Seller;

        2.2.5      all Contracts other than the Assumed Contracts;

        2.2.6      any Contract terminated, rejected, or expired prior to the Closing Date in accordance with the terms of such Contract or in the ordinary course of business;

        2.2.7      all of Seller's bank accounts and lock-boxes other than the US Ticket Buyer Escrow;

        2.2.8      any documents and agreements of Seller relating to Seller's Bankruptcy Case or to the sale or other disposition of the Acquired Assets or the sale or other disposition of any Excluded Assets;

        2.2.9      all Permits;

        2.2.10      other than to the extent of Acquired Assets under Section 2.1 of this Agreement, all claims, cross claims, and causes of action of Seller or the Debtor, including without limitation arising under Sections 542 through 553 of the Bankruptcy Code and against current or former directors and officers of the Debtor;

        2.2.11      all insurance, utility, and tax deposits or refunds owing to Seller other than as provided for in Section 2.1.3;

        2.2.12      Seller's rights under this Agreement and all cash and non-cash consideration payable or deliverable to Seller or the Debtor pursuant to the terms and provisions of this Agreement;

        2.2.13      all insurance policies and insurance agreements, including, without limitation, any directors and officers insurance policies; and

2.3    Instruments of Transfer. The sale, conveyance, assignment, transfer, and delivery of the Acquired Assets to Buyer and the assumption of the Assumed Liabilities provided herein by Buyer shall be made by assignments, bills of sale, and other instruments of assignment, transfer and conveyance provided for in Section 4.3 or as is otherwise necessary to effectuate such sale, conveyance, assignment, transfer, delivery, and assumption. None of the foregoing documents shall increase in any material way the burdens imposed by this Agreement upon Seller or Buyer.

3.    Consideration.

3.1    Purchase Price.

3.1.1    Consideration. The purchase price (the "Purchase Price") for the purchase, sale, assignment, and conveyance of Seller's right, title, and interest in, to, and under the Acquired Assets shall consist of: (i) cash in the amount of $700,000.00 (the "Cash Payment"); plus (ii) the assumption of the Assumed Liabilities.

3.1.2    Deposit. Concurrently with Buyer's delivery of this Agreement, Buyer shall deliver into a segregated account (the "Escrow") maintained by an escrow holder mutually agreed to by the parties (the "Escrow Holder"), acting reasonably, the sum of $250,000.00 (the "Deposit") in immediately available funds. Upon receipt of the Deposit, the Escrow Holder shall immediately place the Deposit into a non-interest-bearing account. The Deposit shall be nonrefundable *unless* this Agreement is terminated as a result of a termination under Sections 6.1.1, 6.1.2, 6.1.3, 6.1.5, and 6.1.6 (each, a "Refund Event"). Notwithstanding the foregoing sentence, the Buyer agrees that $13,000 of the Deposit (the "Website Funds") shall be nonrefundable if the Debtor's website (www.toughmudder.com) is restored and accessible within two (2) Business Days of the Effective Date, which website shall have such terms and content as shall be approved by the Seller in its sole discretion, and (i) in the event Closing occurs, the Cash Payment due and owing to Seller at Closing shall be increased by the amount of the Website Funds or (ii) in the event this Agreement is terminated other than by reason of a Refund Event, Buyer shall reimburse Seller in the amount of the Website Funds within five (5) Business Days following such termination, in each case, as a reimbursement for the costs associated with restoring the aforementioned website. At the Closing, the Deposit shall be delivered to Seller and credited toward payment of the Purchase Price. In the event this Agreement is terminated for any reason other than a Refund Event and Seller is not then in material Default of this Agreement, Escrow Holder shall immediately disburse the Deposit to Seller to be retained by Seller for Seller's own account. If this Agreement is terminated by reason of a Refund Event, the Escrow Holder shall return the Deposit to Buyer within two (2) Business Days.

3.1.3    Payment at Closing. At the Closing, Buyer shall pay to Seller, by wire transfer of immediately available funds to an account designated in writing by Seller to Buyer no later than one (1) Business Days prior to the Closing Date, an amount equal to (x) the Cash Payment minus (y) the amount of the Deposit; and Buyer shall request the release of the Deposit to Seller and take any actions necessary to effectuate such release.

3.2    Cure Claims.  With respect to each of the Assumed Contracts assigned to Buyer on the Closing Date, Buyer shall satisfy, on the Closing Date, all Liabilities thereunder (as distinct from curing all defaults or failures to comply with provisions thereunder that may not be cured by the mere payment of money) (i) accruing or arising at any time prior to or after the Filing Date, or (ii) arising from or relating to any act, event or occurrence prior to the Filing Date that are required to be paid pursuant to §365 of the Bankruptcy Code in order to assume and assign the Assumed Contracts to Buyer (collectively, "Cure Claims").

3.3    Excluded Liabilities.  Buyer shall have no obligation of any kind for, under, arising out of, or in connection with any Excluded Liabilities.

3.4    Allocation of the Purchase Price.  Seller and Buyer agree the Purchase Price and the Assumed Liabilities as well as any other items constituting the amount realized for Tax purposes (the "Allocable Consideration") will be allocated among the Acquired Assets in a manner consistent with Section 1060 of the Tax Code and any Treasury Regulations promulgated thereunder. Buyer will, no later than forty-five (45) days following the Closing Date, prepare and deliver to Seller a schedule setting forth the allocation of the Allocable Consideration in accordance with the preceding sentence (the "Allocation Schedule"). Buyer and Seller will endeavor for a period of thirty (30) days after delivery of the Allocation Schedule to resolve any disputes related to the Allocation Schedule.  If Buyer and Seller are not able to agree to the Allocation Schedule within such thirty (30) day period, the parties shall retain an independent accounting firm (the "Independent Accounting Firm") to resolve their dispute. The determination of the Independent Accounting Firm shall be final and binding on all parties hereto.  The cost of the Independent Accounting Firm shall be borne by Buyer.  In the event that the Allocation Schedule is disputed by any Governmental Authority, the party receiving notice of such dispute will promptly notify the other party and the parties will consult in good faith as to how to resolve such dispute in a manner consistent with the agreed upon Allocation Schedule.  Neither Buyer nor Seller will take any position that is contrary to or inconsistent with the Allocation Schedule for any Tax purpose, including with respect to any Tax Return (including amended Tax Returns).

3.5    Consumer Privacy.  To the extent the appointment of a consumer privacy ombudsman (as that term is used in sections 332 and 363(b)(1) of the Bankruptcy Code) is required, the Buyer and Seller shall negotiate in good faith to determine a reasonable allocation of the Debtor estate's costs of retaining and compensating such consumer privacy ombudsman and the Buyer agrees that its Purchase Price shall increase by such allocable share.

4.    Closing Transactions.

4.1    Closing.  The closing of the transactions provided for herein (the "Closing") shall take place at the offices of Morris, Nichols, Arsht & Tunnell LLP, in Wilmington, Delaware, or at such other location or in such other manner as shall be mutually acceptable to Buyer and Seller, including by electronic means.

4.2    Closing Date.  The Closing shall be held within two (2) days after satisfaction or waiver of the conditions to closing in Section 5 (the "Closing Date"), but in no event later than February 28, 2020 (the "Outside Date").  In the event the conditions to Closing have not been satisfied or waived by the Outside Date, then any party who is not in Default hereunder may

terminate this Agreement, unless the parties mutually agree to an extended Outside Date. Until the Closing Date or until this Agreement is terminated, the parties shall diligently continue to work to satisfy all conditions to Closing.

4.3     Seller's Deliveries to Buyer at Closing.  On the Closing Date, Seller shall deliver the following to Buyer:

4.3.1     a copy of the Sale Order entered by the Bankruptcy Court;

4.3.2     a bill of sale, duly executed by Seller, in substantially the form attached hereto as Exhibit A, pursuant to which Seller transfers the Acquired Assets other than the Assumed Contracts to Buyer (the "Bill of Sale");

4.3.3     an assumption and assignment agreement, duly executed by Seller, in substantially the form attached hereto as Exhibit B, effecting the assumption and assignment of the Assumed Contracts and Assumed Liabilities (the "Assignment and Assumption Agreement");

4.3.4     an intellectual property agreement, duly executed by Seller, in substantially the form attached hereto as Exhibit C, effecting the assumption and assignment of the Intellectual Property Assets (the "IP Assignment Agreement");

4.3.5     a certificate of Seller certifying the satisfaction of the conditions precedent set forth in Section 5.1; and

4.3.6     such other documents and instruments, duly executed by Seller, as required pursuant to Section 2.3.

4.4     Buyer's Deliveries to Seller at Closing.  On the Closing Date, Buyer shall deliver the following to Seller:

4.4.1     by wire transfer the Cash Payment less the amount of the Deposit;

4.4.2     if requested by Seller, instructions to the Escrow Holder to deliver the Deposit to Seller;

4.4.3     instructions to the US Ticket Buyer Escrow to deliver the US Ticket Buyer Escrow Proceeds to Buyer;

4.4.4     a certificate of Buyer certifying the satisfaction of the conditions precedent set forth in Section 5.2;

4.4.5     (i) certified copies of resolutions duly adopted by Buyer's governing body approving the transactions contemplated by this Agreement and authorizing the execution, delivery, and performance by Buyer of this Agreement; and (ii) a certificate as to the incumbency of officers of Buyer executing this Agreement and any instrument or other document delivered in connection with the transactions contemplated by this Agreement;

4.4.6    the Assignment and Assumption Agreement, duly executed by Buyer;

4.4.7    the IP Assignment Agreement, duly executed by Buyer; and

4.4.8    such other documents and instruments, duly executed by Buyer, as required pursuant to <u>Section 2.3</u>.

4.5    <u>Sales, Use, and Other Taxes</u>.  Any sales, purchases, transfer, stamp, documentary stamp, use, or similar taxes which may be payable by reason of the sale of the Acquired Assets under this Agreement or the transactions contemplated herein shall be borne and timely paid by Buyer.

4.6    <u>Possession</u>.  Right to possession of the Acquired Assets shall transfer to Buyer on the Closing Date.  Seller shall transfer and deliver to Buyer on the Closing Date such items as Buyer shall reasonably require to obtain all of Seller's right, title and interest in, to, or under the Acquired Assets.  For the avoidance of doubt, Seller shall have the right to retain copies of any and all Records relating to the Intellectual Property Assets as may be necessary or appropriate for the Bankruptcy Case and winding up the estate of Debtor.

5.    <u>Conditions Precedent to Closing</u>.

5.1    <u>Conditions to Seller's Obligations</u>.  Seller's obligation to sell, convey, assign, transfer and deliver the Acquired Assets to Buyer at the Closing shall be subject to the satisfaction or waiver by Seller of each of the following conditions:

5.1.1    all of the representations and warranties of Buyer contained in <u>Section 8</u> shall continue to be true and correct at the Closing in all material respects, and all covenants and obligations to be performed by Buyer prior to the Closing shall have been performed in all material respects;

5.1.2    Seller shall have received all items deliverable by Buyer pursuant to <u>Section 4.4</u>;

5.1.3    Seller shall have received the Deposit in accordance with <u>Section 3.1.2</u>; and

5.1.4    the Bankruptcy Court shall have entered the Sale Order, and the Sale Order shall not have been stayed, appealed, vacated, reversed, or modified as of the Closing Date.

5.2    <u>Conditions to Buyer's Obligations</u>.  Buyer's obligation to perform any of Buyer's obligations under this Agreement, including paying the Purchase Price to Seller upon the consummation of the Closing, shall be subject to the satisfaction or waiver by Buyer of each of the following conditions:

5.2.1    all representations and warranties of Seller contained in <u>Section 7</u> shall continue to be true and correct at the Closing in all material respects, and

13

all covenants and obligations to be performed by Seller prior to the Closing shall have been performed in all material respects;

5.2.2    Buyer shall have received all items deliverable by Seller pursuant to Section 4.3; and

5.2.3    the Bankruptcy Court shall have entered the Sale Order in form and substance acceptable to Buyer, and the Sale Order shall not have been stayed as of the Closing Date;

5.3    Frustration of Closing Conditions. Neither Buyer nor Seller may rely on the failure of any condition set forth in Section 5.1 or 5.2, as the case may be, if such failure was caused by such party's failure to comply with any provision of this Agreement.

6.    Termination.

6.1    Means of Termination. This Agreement may be terminated prior to the Closing as follows:

6.1.1    by Seller or Buyer, if the Closing has not occurred by the close of business on the Outside Date; provided, however, that if the Closing shall not have occurred on or before the Outside Date due to a material breach of any representations, warranties, covenants, agreements, or obligations contained in this Agreement by Buyer or Seller, then the breaching party may not terminate this Agreement pursuant to this Section 6.1.1;

6.1.2    by mutual written consent of Seller and Buyer;

6.1.3    by Buyer, if there shall be a Default of a condition set forth in Section 5.2 and which Default cannot be cured or has not been cured (or waived by Buyer) by the Outside Date; provided, further, that Buyer may terminate this Agreement pursuant to this Section 6.1.3 only if Buyer is not in material breach of this Agreement as of the date of such termination;

6.1.4    by Seller, if there shall be a Default of a condition set forth in Section 5.1 and which Default cannot be cured or has not been cured by the Outside Date; provided, further, that Seller may terminate this Agreement pursuant to this Section 6.1.4 only if Seller is not in material breach of this Agreement as of the date of such termination;

6.1.5    by Seller or Buyer, if there shall be in effect an Order of a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions set forth in this Agreement;

6.1.6    automatically, if Seller enters into a definitive agreement with respect to an Alternative Transaction and the Bankruptcy Court enters an Order approving an Alternative Transaction, subject to Buyer's right to the Break-up Fee and Expense Reimbursement in accordance with the provisions of Section 10.2.3, and such Alternative Transaction closes.

14

6.2    Procedure Upon Termination.  In the event of termination by Buyer or Seller, or both, pursuant to Section 6.1, written notice thereof shall forthwith be given to the other party, and this Agreement shall terminate, and the purchase of the Acquired Assets hereunder shall be abandoned, without further action by Buyer or Seller.  If this Agreement is terminated as provided herein, each party shall redeliver all documents, work papers and other material of any other party relating to the transactions set forth herein, whether so obtained before or after the execution hereof, to the party furnishing the same.

6.3    Effect of Termination.  In the event that this Agreement is validly terminated as provided herein prior to the Closing, then each of the parties shall be relieved of its duties, covenants, agreements, and obligations arising under this Agreement after the date of such termination and such termination shall be without liability to Buyer or Seller; provided, however, that the covenants, agreements and obligations of the parties set forth in Section 3.1.2, Section 6.1.6, this Section 6.3, and Section 11 shall survive any such termination and shall be enforceable hereunder.

7.    Seller's Representations and Warranties.

Seller represents and warrants to Buyer that as of the date hereof and as of Closing:

7.1    Organization and Qualification.  The Debtor is duly incorporated, validly existing, and in good standing under the laws of the State of Delaware; provided, however, that Seller and Buyer acknowledge that Tough Mudder Incorporated is not in good standing as of the date of this Agreement, which shall not constitute a Default under this Agreement so long as such entity is restored to good standing status prior to the Closing.

7.2    Due Authorization.  Upon entry of the Sale Order, the execution and delivery of this Agreement by Seller, the sale of the Acquired Assets, and the performance of the obligations of Seller and the Debtor contemplated hereby have been duly and validly authorized by all necessary corporate action.  Seller has the right, power, authority, and legal capacity to enter into and perform this Agreement and the transaction contemplated hereby, and this Agreement constitutes the valid and binding agreement of the Debtor, enforceable against the Debtor in accordance with its terms, subject to entry of the Sale Order.

7.3    Conflict with Other Instruments; Absence of Restrictions.  The execution and delivery of this Agreement, the consummation of the transactions contemplated by this Agreement, and performance of, fulfillment of, and compliance with the terms and conditions hereby by Seller does not and will not: (i) conflict with or result in a breach of the organizational documents of the Debtor; or (ii) violate any Law binding on the Debtor.

7.4    Title to the Acquired Assets.  To Seller's Knowledge, the Debtor owns and has marketable legal and beneficial title to all of the Acquired Assets. On the Closing Date, Seller will deliver all of the Debtor's right, title and interest in the Acquired Assets free and clear of all Encumbrances, other than Permitted Encumbrances and Assumed Liabilities.

7.5    No Other Representations and Warranties.  Except for the representations and warranties contained in this Section 7, neither Seller nor any other Person, including the Debtor, makes (and Buyer is not relying upon) any other express or implied representation or warranty

15

with respect to the Debtor, the Debtor's business, the Acquired Assets (including the value, condition, or use of any Acquired Asset), the Assumed Liabilities or the transactions contemplated by this Agreement, and Seller disclaims any other representations or warranties, whether made by the Debtor, Seller, any Affiliate of Seller or the Debtor or any of their respective Representatives. Except for the representations and warranties contained in this Section 7, Seller (i) expressly disclaims and negates any representation or warranty, express or implied, at common law, by statute or otherwise, relating to the condition of the Acquired Assets (including any implied or expressed warranty of title, merchantability or fitness for a particular purpose, or of the probable success or profitability of the ownership, use or operation of the Debtor's business or the Acquired Assets by Buyer after the Closing), and (ii) disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Buyer or its Affiliates or Representatives (including any opinion, information, projection or advice that may have been or may be provided to Buyer by any Representative of Seller or the Debtor).

8.    Buyer's Representations and Warranties.

Buyer represents and warrants to Seller and the Debtor as of the date hereof and as of Closing as follows:

8.1    Validity of Agreement.    All action on the part of Buyer necessary for the authorization, execution, delivery and performance of this Agreement by Buyer, including, but not limited to, the performance of Buyer's obligations hereunder, has been duly taken. This Agreement, when executed and delivered by Buyer, shall constitute the valid and binding obligation of Buyer enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity and entry of the Sale Order.

8.2    Organization, Standing and Power.    Buyer is a corporation duly organized, validly existing, and in good standing under the laws of its state of formation or organization. Buyer has all requisite power and authority to own, lease, and operate Buyer's properties, to carry on Buyer's business as now being conducted and to execute, deliver, and perform this Agreement and any other agreements relating hereto.

8.3    No Conflicts or Violations.    The execution and delivery of this Agreement, the consummation of the transactions contemplated by this Agreement, and the performance of, fulfillment of, and compliance with the terms and conditions hereof by Buyer do not and will not: (i) conflict with or result in a breach of the organizational documents of Buyer; (ii) violate any Law binding on Buyer; or (iii) violate or conflict with or constitute a Default under any Contract to which Buyer is a party or by which Buyer or Buyer's assets or properties may be bound.

8.4    Ability to Close and Perform.    Buyer has sufficient liquid assets available to Buyer to pay the Purchase Price on the Closing Date and to pay and perform the Assumed Liabilities.

8.5    Brokers' Fees. Neither Buyer nor any of its Affiliates has entered into any Contract to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated by this Agreement for which Seller could become liable or obligated to.

9.    "As Is" Transaction.

BUYER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN SECTION 7 ABOVE, SELLER AND THE DEBTOR MAKE NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE ACQUIRED ASSETS, THE ASSUMED CONTRACTS, OR ASSUMED LIABILITIES INCLUDING EXPENSES TO BE INCURRED IN CONNECTION WITH SUCH ASSETS AND LIABILITIES, THE PHYSICAL CONDITION OF ANY PERSONAL PROPERTY COMPRISING A PART OF THE ACQUIRED ASSETS OR WHICH IS THE SUBJECT OF ANY CONTRACT TO BE ASSUMED BY BUYER AT THE CLOSING, THE VALUE OF THE ACQUIRED ASSETS (OR ANY PORTION THEREOF), THE TRANSFERABILITY OF PROPERTY, THE TERMS, AMOUNT, VALIDITY OR ENFORCEABILITY OF ANY ASSUMED LIABILITIES OR ASSUMED CONTRACTS, THE MERCHANTABILITY OR FITNESS OF THE PROPERTY OR ANY OTHER PORTION OF THE ACQUIRED ASSETS FOR ANY PARTICULAR PURPOSE, OR ANY OTHER MATTER OR THING RELATING TO THE DEBTOR'S BUSINESS, THE ACQUIRED ASSETS OR ANY PORTION THEREOF. WITHOUT IN ANY WAY LIMITING THE FOREGOING, SELLER AND THE DEBTOR HEREBY DISCLAIM ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE ACQUIRED ASSETS. BUYER FURTHER ACKNOWLEDGES THAT BUYER HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL CONDITION OF THE ACQUIRED ASSETS AND ALL SUCH OTHER MATTERS RELATING TO OR AFFECTING THE ACQUIRED ASSETS AS BUYER DEEMED NECESSARY OR APPROPRIATE AND THAT IN PROCEEDING WITH ITS ACQUISITION OF THE ACQUIRED ASSETS, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN SECTION 7, BUYER IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS. ACCORDINGLY, BUYER WILL ACCEPT THE ACQUIRED ASSETS AT THE CLOSING "AS IS," "WHERE IS," "WITH ALL FAULTS," AND "QUIT CLAIM" BASIS. FURTHERMORE BUYER HEREBY EXPRESSLY ACKNOWLEDGES THAT THE ASSIGNMENT AND ASSUMPTION OF THE ASSUMED CONTRACTS FORMING PART OF THE ACQUIRED ASSETS WILL BE CONSUMMATED IN ACCORDANCE WITH THE TERMS OF THIS AGREEMENT AND THE SALE ORDER NOTWITHSTANDING ANY AND ALL OUTSTANDING DEFAULTS AND OTHER CLAIMS FOR FAILURES TO COMPLY WITH THE PROVISIONS OF SUCH CONTRACTS, CERTAIN OF WHICH DEFAULTS OR CLAIMS MAY NOT BE SUBJECT TO CURE OR WAIVER.

10.    Conduct and Transactions Prior to Closing.

10.1    Access to Records and Properties of the Debtor. From and after the date of this Agreement until the Closing Date, subject to execution of a confidentiality agreement customary to similar transactions, Seller shall, upon reasonable advance notice, afford to Buyer's

17

Representatives, reasonable access during normal business hours to the Acquired Assets to the extent Seller is reasonably able to provide such access and all records pertaining to the Acquired Assets. Buyer, however, shall not be entitled to access any materials containing privileged communications.

10.2    Bankruptcy Court Matters.

10.2.1    This Agreement is subject to approval by the Bankruptcy Court as a private sale. From the Effective Date and until the objection deadline established by the Court with respect to the Sale Motion, to the extent Seller determines necessary in the exercise of his fiduciary duty, Seller is permitted to cause its Representatives to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Buyer and its Affiliates and Representatives) in connection with any sale or other disposition of the Acquired Assets. Seller may respond to and otherwise deal with any inquiries or offers to purchase all or any part of the Acquired Assets and perform any and all other acts related thereto that are required under the Bankruptcy Code or other applicable Law, including supplying information relating to the Debtor's business and the assets of the Debtor or any of its Affiliates to prospective purchasers. Seller shall have no obligation to perform the obligations under this Agreement if in the exercise of his fiduciary duties Seller determines that performance is not in the best interests of the Debtor or its estate.

10.2.2    Seller will file the Sale Motion on or before February 7, 2020 to seek an order of the Bankruptcy Court in form and substance acceptable to Buyer that (a) approves the sale of the Acquired Assets to Buyer on the terms and conditions set forth in this Agreement and authorizes Seller to proceed with the sale of the Acquired Assets to Buyer on the terms and conditions set forth in this Agreement, (b) includes a specific finding that Buyer is a good faith purchaser of the Acquired Assets within the meaning of §363(m) of the Bankruptcy Code and is entitled to the protections of §363(m) of the Bankruptcy Code and the provisions of Section 363(n) of the Bankruptcy Code have not been violated by Buyer, (c) states that the sale of the Acquired Assets to Buyer shall be free and clear of all Encumbrances (except as expressly provided in this Agreement) pursuant to Sections 105(a) and 363(f) of the Bankruptcy Code, and provide that any Encumbrance attach solely to the proceeds of the sale under Bankruptcy Code Section 363, (d) approves Seller's procedures[1] for the assumption and assignment to Buyer of the Assumed Contracts pursuant to §365 of the Bankruptcy Code, subject to Buyer's ability to demonstrate to the Bankruptcy Court adequate assurance of future performance under the Assumed Contracts, and provide that notwithstanding the possible applicability of Bankruptcy Rules 4001, 6004(h), 6006(d), 7062, 9014, or otherwise, the Sale Order shall be immediately effective and enforceable upon its entry (the "Sale Order"). Both Buyer's and Seller's obligations to consummate the transactions contemplated in this Agreement are conditioned upon the Bankruptcy Court's entry of the Sale Order.

10.2.3    In the event that this Agreement is terminated pursuant to Section 6.1.6 or if Seller otherwise closes an Alternative Transaction within two (2) months from the

Effective Date, Seller, on behalf of the Debtor, shall pay to Buyer a cash amount equal to $20,000.00 (the "Break-Up Fee"), and the Expense Reimbursement in cash. The Expense Reimbursement and Break-Up Fee will be due and payable upon the closing of an agreement providing for an Alternative Transaction. Notwithstanding anything herein to the contrary, the Buyer acknowledges and agrees that the Seller will not have and has no liability with respect to the payment of the Expense Reimbursement and the Break-Up Fee and that such obligations are the obligations of the Debtor only.

      10.2.4    Announcement of Agreement; Assumed Event Ticket Sales. The Buyer will consult with the Seller on the terms of any press release concerning the Agreement and Acquired Assets. The Buyer may then issue one or more press releases upon the prior approval of Seller, which shall not be unreasonably withheld, announcing the existence of this Agreement and intent to hold Assumed Events, subject to entry of the Sale Order and Closing. The Parties agree to work in good faith to return the Debtor's website and internet presence to functionality at the expense of Buyer pursuant to Section 3.1.2 to make a portion of the Deposit non-refundable. The Seller may, but has no obligation to, resume selling Tough Mudder event registrations through the Debtor's event registration platform with Active for each of the Assumed Events. Any sales made after the Filing Date shall be deemed a US Ticket Sales and the proceeds delivered to the US Ticket Buyer Escrow. The Seller reserves the right to condition any resumption of ticket sales on obtaining a satisfactory indemnity from the Buyer; provided, however, that any third party buyer under an Alternative Transaction must provide a replacement indemnification that is substantively identical to any indemnity provided by Buyer, and thereafter Buyer's indemnification would be void and have no force or effect.

11.    Miscellaneous.

      11.1    Reasonable Access to Records. So long as the Bankruptcy Cases are pending, following the Closing, Buyer shall provide Seller and Seller's Representatives with reasonable access to all Records relating to the Acquired Assets for the purpose of the continuing administration of the Bankruptcy Cases and pursuing claims of Seller which access shall include (a) the right of Seller's Representatives to copy, at Seller's expense, such non-privileged documents and records as Seller or Seller's Representatives may request in furtherance of the purposes described above, and (b) Buyer's copying and delivering to Seller or Seller's Representatives such documents or records as Seller or Seller's Representatives may request, but only to the extent Seller or Seller's Representatives furnish Buyer with reasonably detailed written descriptions of the materials to be so copied and Seller reimburses Buyer for the reasonable costs and expenses thereof.

      11.2    Notices. Unless otherwise provided herein, any notice, tender, or delivery to be given hereunder by either party to the other may be effected by personal delivery in writing, or by registered or certified mail, postage prepaid, return receipt requested, and shall be deemed communicated as of the date of mailing. Mailed notices shall be addressed as set forth below, but each party may change his address by written notice in accordance with this paragraph.

To Seller:

Derek C. Abbott
Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
Email: dabbott@mnat.com

With a copy (that will not constitute notice) to:

R. Jason Russell
Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
Email: jrussell@mnat.com

To Buyer:

Joseph Desena
Spartan Race, Inc.
234 Congress Street, 5th Floor
Boston, MA 02110
Email: spartanracehq@gmail.com

With a copy (that will not constitute notice) to:

Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
One Financial Center
Boston, MA 02111
Attention: Adrienne Walker, Esq.
Email: awalker@mintz.com

   11.2.1 Entire Agreement. This instrument and the documents to be executed pursuant hereto contain the entire agreement between the parties relating to the sale of the Acquired Assets. Any oral representations or modifications concerning this Agreement or any such other document shall be of no force and effect excepting a subsequent modification in writing, signed by the party to be charged.

   11.2.2 Incorporation of Exhibits and Schedules. The exhibits and schedules to this Agreement are incorporated herein by reference and made a part hereof.

   11.2.3 Modification. This Agreement may be modified, amended or supplemented only by a written instrument duly executed by all the parties hereto.

   11.2.4 Closing Date. All actions to be taken on the Closing pursuant to this Agreement shall be deemed to have occurred simultaneously, and no act, document, or

transaction shall be deemed to have been taken, delivered, or effected until all such actions, documents, and transactions have been taken, delivered, or effected.

11.2.5    <u>Captions</u>.  All captions and headings contained in this Agreement are for convenience of reference only and shall not be construed to limit or extend the terms or conditions of this Agreement.

11.2.6    <u>Further Assurances</u>.  Each party hereto will execute, acknowledge and deliver any further assurance, documents, and instruments reasonably requested by any other party hereto for the purpose of giving effect to the transactions contemplated herein or the intentions of the parties with respect thereto.

11.2.7    <u>Waiver</u>.  No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of other provisions, whether or not similar, nor shall any waiver constitute a continuing waiver.  No waiver shall be binding unless executed in writing by the party making the waiver; <u>provided</u>, <u>however</u>, that the consent of a party to the Closing shall constitute a waiver by such party of any conditions to Closing not satisfied as of the Closing Date.

11.2.8    <u>Payment of Fees and Expenses</u>.  Each party to this Agreement shall be responsible for, and shall pay, all of such party's own fees and expenses, including those of such party's counsel, incurred in the negotiation, preparation and consummation of this Agreement and the transactions described herein. Subject to Bankruptcy Court approval in the Bidding Protections Order, the Break-Up Fee and Expense Reimbursement shall constitute allowed administrative expense claims against Seller with priority over all administrative expense claims and unsecured claims against Seller.

11.2.9    <u>Obligations of Seller</u>.  Notwithstanding anything in this Agreement to the contrary, the obligations of Seller pursuant to this Agreement shall be subject to any orders entered, or approvals or authorizations granted or required, by or under the Bankruptcy Court or the Bankruptcy Code (including in connection with the Bankruptcy Case), and Seller's obligations as a bankruptcy trustee to comply with any order of the Bankruptcy Court (including the Bidding Procedures Order and the Sale Order).

11.2.10    <u>Survival</u>.  Except for the covenants and agreements to be performed after the Closing Date, none of the respective representations, warranties, covenants, and agreements of Seller and Buyer herein, or in any certificates or other documents delivered prior to or at the Closing, shall survive the Closing.

11.2.11    <u>Assignments</u>.  This Agreement shall not be assigned by any party hereto without the prior written consent of Buyer, in the case of any assignment by Seller, or Seller, in the case of any assignment by Buyer.

11.2.12    <u>Binding Effect</u>.  This Agreement shall bind and inure to the benefit of the respective heirs, personal representatives, successors, and assigns of the parties hereto.

11.2.13    <u>Applicable Law</u>.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL BANKRUPTCY LAW, TO

21

THE EXTENT APPLICABLE, AND WHERE STATE LAW IS IMPLICATED THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF, INCLUDING AS TO MATTERS OF CONSTRUCTION, VALIDITY, AND PERFORMANCE.

11.2.14    Good Faith.  All parties hereto agree to do all acts and execute all documents required to carry out the terms of this Agreement and to act in good faith with respect to the terms and conditions contained herein before and after the Closing.

11.2.15    Construction.  In the interpretation and construction of this Agreement, the parties acknowledge that the terms hereof reflect extensive negotiations between the parties and that this Agreement shall not be deemed, for the purpose of construction and interpretation, drafted by either party hereto.

11.2.16    Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.  A manual signature on this Agreement or other documents to be delivered pursuant to this Agreement, an image of which shall have been transmitted electronically, will constitute an original signature for all purposes.  The delivery of copies of this Agreement or other documents to be delivered pursuant to this Agreement, including executed signature pages where required, by electronic transmission will constitute effective delivery of this Agreement or such other document for all purposes.

11.2.17    Time is of the Essence.  Time is of the essence in this Agreement, and all of the terms, covenants and conditions hereof.

11.2.18    Bankruptcy Court Jurisdiction.  BUYER AND SELLER AGREE THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER ALL DISPUTES AND OTHER MATTERS RELATING TO (i) THE INTERPRETATION AND ENFORCEMENT OF THIS AGREEMENT OR ANY ANCILLARY DOCUMENT EXECUTED PURSUANT TO THIS AGREEMENT; OR (ii) THE ACQUIRED ASSETS AND ASSUMED LIABILITIES ASSUMED PURSUANT TO OR ARISING OUT OF THIS AGREEMENT OR ANY ANCILLARY DOCUMENT EXECUTED PURSUANT TO THIS AGREEMENT, AND BUYER EXPRESSLY CONSENTS TO AND AGREES NOT TO CONTEST SUCH EXCLUSIVE JURISDICTION; PROVIDED THAT IF THE BANKRUPTCY COURT IS UNWILLING OR UNABLE TO HEAR ANY SUCH DISPUTES AND OTHER MATTERS, THEN THE COURTS OF THE STATE OF DELAWARE, SITTING IN NEW CASTLE COUNTY, AND THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA SITTING IN THE STATE OF DELAWARE SHALL HAVE EXCLUSIVE JURISDICTION OVER SUCH DISPUTES AND OTHER MATTERS. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

11.2.19   <u>No Third Party Beneficiaries</u>.  This Agreement shall not confer any rights or remedies upon any Person other than the parties and their respective successors and permitted assigns.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

**BUYER**:

SPARTAN RACE, INC.

By: _____
Name: David Piperno
Title:  Chief Financial Officer


**SELLER**:

DEREK C. ABBOTT, NOT INDIVIDUALLY,
BUT SOLELY IN HIS CAPACITY AS CHAPTER
11 TRUSTEE OF THE BANKRUPTCY ESTATE
OF TOUGH MUDDER INCORPORATED AND
TOUGH MUDDER EVENT PRODUCTION
INCORPORATED


By: _____
Name:  Derek C. Abbott, Chapter 11 Trustee

*[Signature Page to Asset Purchase Agreement]*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

**BUYER**:

SPARTAN RACE, INC.

By: _____
Name: David Piperno
Title:  Chief Financial Officer

**SELLER**:

DEREK C. ABBOTT, NOT INDIVIDUALLY,
BUT SOLELY IN HIS CAPACITY AS CHAPTER
11 TRUSTEE OF THE BANKRUPTCY ESTATES
OF TOUGH MUDDER INCORPORATED AND
TOUGH MUDDER EVENT PRODUCTION
INCORPORATED

By: _____
Name:  Derek C. Abbott, Chapter 11 Trustee

*[Signature Page to Asset Purchase Agreement]*

## Schedule 1.1.10 - Assumed Contracts

| Contract Type | Contract Name | Counterparty Address | Counterparty Contact Name | Effective Date | Cure Claims |
|---|---|---|---|---|---|
| Vendor / Service Provider | Diffusion | 244 5th avenue New York, NY 10001 | Liz Duggan | 11/01/2019 | $16,001 |
| Software License | IBM/Silverpop | 3 east 28th street New York, NY 10016 | Mark Hetterly | 10/01/2019 | $36,213 |
| Vendor / Service Provider | Pantheon | 717 California Street San Francisco CA 94108 | Job Gregory | 11/01/2019 | $13,256.69 |
| Vendor / Service Provider | Wondersauce | 45 West 25th Street, 6th Floor New York, NY 10010 | Megan Blake | 5/16/2019 | $42,500 |
| Software License | One Trust | 1200 Abernathy Rd NE, Building 600 Atlanta, Georgia 30328 | Steve Rubenstein | 6/18/2019 | $6,336.00 |
| Software License | Bynder | Subscription Service | N/A | 4/3/2019 | Unk, Credit Card |
| Software License | AWS | Subscription Service | N/A | Monthly subscription | ~$3,000 |
| Software License | Github | Subscription Service | N/A | Monthly subscription | $100, on credit card |
| Software License | Cloudingo | Subscription Service | N/A | April 2019 | $0 |
| Vendor / Service Provider | Materialogic | Materialogic 3100 Corporate Exchange Ct, Bridgeton, MO 63044 | A. Milton Cornwell | 1/1/2014 | $22,543.14 |
| Vendor / Service Provider | Ryder Leasing | Ryder Shared Services Center - Customer Care, 6000 Windward Pkwy, Alpharetta, GA 30005. | Rental Agreement #'s: 00707765 00731074 00731478 00733093 00733094 00733096 00733097 00733098 00733194 | Various, rental agreements | $0 |
| Software License | Rosterfy | 2420 17th Street Tenant LLC 2420 17th St Denver, CO 80202 | Shannon Gove | Quarterly subscription | $2,876.45 |

| Contract Type | Contract Name | Counterparty Address | Counterparty Contact Name | Effective Date | Cure Claims |
|---|---|---|---|---|---|
| Vendor / Service Provider | Dyehard Fan Supply | Dyehard Fan Supply 1001 West Fourth Street Winston-Salem, NC 27101 | Scott Killian | 1/1/2018, Amended for 1/1/2020 | $0 |
| Software License | G-Suite | Subscription Service | N/A | June 2019 | $0 |
| Licensee | Tough Mudder Bootcamp | TM Bootcamp c/o John M. Cross, Jr. Brooks Pierce 2000 Renaissance Plaza 230 North Elm Street Greensboro, N.C. 27401 | Britt Canady / John Cross | 5/25/19 | $0 |
| Sponsor / Revenue / Comm. Support | EveryManJack | Every Man Jack 500 Tamal Plaza Suite 505 Corte Madera, CA 94925 | Ritch Viola | 1/1/2019 | $0 |
| Sponsor / Revenue / Comm. Support | Navy Federal Credit Union | Navy Federal Credit Union 820 Follin Lane Vienna, VA 22180 | Patty Valezuela Stover | 1/1/2019 | $0 |
| Sponsor / Revenue / Comm. Support | EventHub | Event Hub 6523 California Avenue, Suite 148, Seattle, WA 98136 | Michael Bleu | 10/2019 | $0 |
| Licensee | IMG (Australia) | IMG Level 8 580 St. Kilda Road Melbourne, Victoria, Australia | Marcus Gale | 1/1/19 | $635.00 |
| Licensee | Runireland (Ireland) | Runireland Ltd. Unit 3 Liosban Business Park, Tuam Road Galway, Ireland | Ray O'Connor | 7/24/19 | $0 |
| Licensee | Crescent Valley Ltd (South Africa) | Cresent Valley Pty Ltd. 35 Bell Cresent Tokai, WC 7945 | Andrew Douglas | 9/1/17 | $0 |
| Licensee | Sabco Sports (UAE, Oman, Bahrain, Pakistan, Qatar) | Sabco Sports LLC PO Box 3779 PC 112, Ruwi Muscat, Sultanate of Oman | Nic Cartwright | 1/1/19 | $0 |

| Contract Type | Contract Name | Counterparty Address | Counterparty Contact Name | Effective Date | Cure Claims |
|---|---|---|---|---|---|
| Licensee | KHO Capital (Philippines) | KHO Capital<br>832 A. Arnaiz Ave<br>2nd Floor<br>Makati, Philippines | Jake Zimmerman | 1/1/20 | $0 |
| Licensee | Black Tie Sports (Croatia) | Black Tie Sports Ltd.<br>Wangdun Road 135<br>Ste. Suzhou, China | Marko Martinović | 8/1/18 | $0 |
| Licensee | Realize Massive (Italy) | Realize S.R.L.<br>Piazza IV Novembre<br>4-20124<br>Milano, Italy | Fabiana De Rosa | 12/1/18 | $0 |
| Licensee | TriFactory (egypt) | The TriFactory<br>17 Mansour Mohamed Street<br>Zamalek, Cairo, Egypt 11211 | Ayman Hakky | 5/1/19 | $0 |
| Licensee | Ponto Org Organizacao de Eventos Ltda | Ponto Org Organizacao de Eventos Ltda<br>(Brasil)<br>Rua Arrudas 245<br>Sala 05, Santa Lucia<br>Belo Horizonte MG Brasil | Henrique Gomes | 6/1/19 | $0 |
| Licensee | Cho TM Korea (South Korea) | Andrew Cho<br>200 Winston Drive<br>Cliffside Park, NJ 07010 | Andrew Cho | 10/1/19 | $0 |
| Licensee | Hamburger Asia (Singapore, Malaysia) | Hamburger Asia Sdn. Bhd.<br>Level 7, Oasis Wing,<br>Brunsfield, Oasis Tower 3, 2, Jalan PJU 1A/7A,<br>Oasis Square, Oasis Damansara<br>47301 Petaling Jaya, Selangor Darul Ehsan | Miyeera Navaretna | 10/1/19 | $0 |

# Schedule 1.1.11 - Assumed Events

| Venue Name | Counterparty Address | Counterparty Name | Event Dates | Brief Description | Effective Date | Cure Claims |
|---|---|---|---|---|---|---|
| Camp William B. Snyder (Boy Scouts of America) | 6100 Antioch Rd, Haymarket, VA 20169<br><br>Notice Address:<br>National Capital Area Council, BSA<br>9190 Rockville Pike,<br>Bethesda, MD 20814 | Mario Perez | May 30-31, 2020 | Virginia Venue | 9/25/19 | $25,000 |
| Wild Wings of Oneka | 9491 152nd St. N<br>Hugo, MN 55038 | Jeff Hughes | July 11-12, 2020 | Twin Cities Venue | 4/9/19 | $0 |
| Chicago Rockford International Airport | Greater Rockford Airport Authority<br>2 Airport Cir, Rockford, IL 61109 | Michael Dunn | August 22-23, 2020 | Chicago Venue | 9/30/2019 | $0 |
| Raceway Park | Old Bridge Township Raceway, Inc.<br>230 Pension Rd, Englishtown, NJ 07726 | Michael Napoliello | Sept 12-13, 2020 | Tri-State Venue | 9/18/19 | $110,000 |
| Palmer Coking Coal Company | 31407 WA-169, Black Diamond, WA 98010 | William Kombol | Sept 19-20, 2020 | Seattle Venue | 9/19/19 | $13,879 |
| Lake Elsinore | 500 Diamond Dr, Lake Elsinore, CA 92530 | Mark Beskid | Nov 14-15, 2020 (will want to shift to October) | So Cal Venue | 9/30/19 | $10,000 |

**Schedule 2.1.6 - Intellectual Property Assets**

| Mark Name | Country | Application | Registration |
|---|---|---|---|
| TOUGH MUDDER | Australia | 1095812 | 8/23/2011 |
| FUNKY MONKEY | Australia | 1565324 | 5/23/2013 |
| ELECTROSHOCK THERAPY | Australia | A0035955 | 5/23/2013 |
| EVEREST | Australia | 1565415 | 5/23/2013 |
| TOUGH MUDDER | Australia | 1554879 | 4/3/2013 |
| ARCTIC ENEMA | Australia | 1565231 | 5/23/2013 |
| MINI MUDDERS | Australia | 1521267 | 3/17/2015 |
| TOUGH MUDDER AND DESIGN (MAN W/FLAMES) | Australia | 1501433 | 7/11/2012 |
| TOUGH MUDDER HALF (AND DESIGN) | Australia | 1,732,742 | 11/5/2015 |
| TOUGH MUDDER LOGO NO FLAMES | Australia | A0035200 | 4/10/2013 |
| TOUGH MUDDER RUNNING MAN | Australia | A0035199 | 4/10/2013 |
| TOUGH MUDDER AND DESIGN (MAN W/FLAMES) | Canada | 1,584,295 | 4/28/2014 |
| MINI MUDDER | Canada | 1,712,048 | 4/12/2016 |
| TOUGH MUDDER | Canada | 1,540,495 | 10/10/2012 |
| TOUGH MUDDER | China | 19106975 | |
| TOUGH MUDDER | China | 19106977 | |
| TOUGH MUDDER HALF | China | 19,106,979 | |
| TOUGH MUDDER | China | 19106978 | 3/21/2018 |
| TOUGH MUDDER | China | 22673062 | 2/21/2018 |
| TOUGH MUDDER | China | 22673061 | |
| TOUGH MUDDER | China | 18032519 | 11/14/2016 |
| MUD TOUGH MAN TEAM OBSTACLE CHALLENGE (in Chinese) | China | 19191570 | 4/7/2017 |
| MUD TOUGH MAN TEAM OBSTACLE CHALLENGE (in Chinese) | China | 19191571 | 4/7/2017 |
| Strongest Mudder International Obstacle Challenge (in Chinese) | China | 19829217 | 6/21/2017 |
| Strongest Mudder International Obstacle Challenge (in Chinese) | China | 19829218 | 6/21/2017 |
| TOUGH MUDDER AND DESIGN (MAN W/FLAMES) | China | 19106976 | 3/21/2018 |
| TOUGH MUDDER AND DESIGN (MAN W/FLAMES) | China | 22673060 | |
| TOUGH MUDDER AND DESIGN (MAN W/FLAMES) | China | 22673059 | |
| Strongest Mudder Obstacle Challenge – Half Distance (in Chinese) | China | 19829216 | 6/21/2017 |
| Strongest Mudder Obstacle Challenge – Half Distance (in Chinese) | China | 19829215 | 6/21/2017 |
| TOUGH MUDDER HALF (AND DESIGN) | China | 22673064 | |
| TOUGH MUDDER HALF (AND DESIGN) | China | 22673063 | |
| TOUGH MUDDER HALF (AND DESIGN) | China | 19106980 | 3/21/2018 |
| Toughest Mudder (in Chinese) | China | 19854759 | 6/21/2017 |
| Toughest Mudder (in Chinese) | China | 19854758 | 6/21/2017 |
| TOUGH MUDDER (MAN W/FLAMES) | China | 27401801 | |
| TOUGH MUDDER HALF (AND DESIGN) | China | 27401800 | |
| TOUGH MUDDER | China | 31793586 | |
| TOUGH MUDDER | Colombia | 13.253.911 | 7/29/2014 |
| ELECTROSHOCK THERAPY | EU IPO | A0035955 | 5/23/2013 |
| ARCTIC ENEMA | EU IPO | A0035958 | 5/23/2013 |
| TOUGH MUDDER | EU IPO | A0035078 | 4/3/2013 |
| EVEREST | EU IPO | A0035953 | 5/23/2013 |
| TOUGH MUDDER | EU IPO | 1095812 | 8/23/2011 |
| TOUGH MUDDER (MAN W/FLAMES) | EU IPO | A0035007 | 3/29/2013 |

| Mark Name | Country | Application | Registration |
|---|---|---|---|
| MISSION: MUDDER | EU IPO | 16464786 | 6/6/2018 |
| TOUGH MUDDER RUNNING MAN | EU IPO | A0035199 | 4/10/2013 |
| TOUGH MUDDER LOGO NO FLAMES | EU IPO | A0035200 | 4/10/2013 |
| TOUGH MUDDER (MAN W/ FLAMES) | HK | 302606715 | 12/11/2013 |
| TOUGH MUDDER (MAN W/OUT FLAMES) | HK | 302606698 | 12/11/2013 |
| TOUGH MUDDER HALF (AND DESIGN) | HK | 303677149 | 2/2/2016 |
| TOUGH MUDDER AND DESIGN (MAN W/FLAMES) | Indonesia | J00.2016.006905 | |
| TOUGH MUDDER AND DESIGN (MAN W/FLAMES) | Indonesia | D00.2016.006900 | |
| TOUGH MUDDER | Indonesia | D00.2016.006903 | |
| TOUGH MUDDER | Indonesia | J00.2016.006908 | |
| TOUGH MUDDER HALF (AND DESIGN) | International | A0072730 | 1/10/2018 |
| TOUGH MUDDER HALF (AND DESIGN) | International | A0072730 | 1/10/2018 |
| TOUGH MUDDER | International | A0072738 | 4/10/2013 |
| TOUGH MUDDER LOGO NO FLAMES | International | A0035200 | 4/10/2013 |
| TOUGH MUDDER RUNNING MAN | International | A0035199 | 4/10/2013 |
| ARCTIC ENEMA | International | A0035958 | 5/23/2013 |
| FUNKY MONKEY | International | A0035957 | 5/23/2013 |
| TOUGH MUDDER | International | A0035078 | 4/3/2013 |
| EVEREST | International | A0035953 | 5/23/2013 |
| TOUGH MUDDER | International | A0035633 | 5/6/2013 |
| TOUGH MUDDER | International | 1095812 | 8/23/2011 |
| ELECTROSHOCK THERAPY | International | A0035955 | 5/23/2013 |
| TOUGH MUDDER | International | A0035007 | 3/29/2013 |
| TOUGH MUDDER (MAN W/FLAMES) | Japan | A0035007 | 3/29/2013 |
| TOUGH MUDDER HALF (AND DESIGN) | Japan | 2016-12438 | 7/1/2016 |
| TOUGH MUDDER | Japan | A0035078 | 4/3/2013 |
| TOUGH MUDDER | Japan | 1095812 | 8/23/2011 |
| TOUGH MUDDER RUNNING MAN | Japan | A0035199 | 4/10/2013 |
| TOUGH MUDDER LOGO NO FLAMES | Japan | A0035200 | 4/10/2013 |
| TOUGH MUDDER HALF (AND DESIGN) | KR | 45-2016-0001528 | 11/22/2016 |
| TOUGH MUDDER LOGO NO FLAMES | KR | A0035200 | 4/10/2013 |
| TOUGH MUDDER RUNNING MAN | KR | A0035199 | 4/10/2013 |
| TOUGH MUDDER | KR | A0035078 | 4/3/2013 |
| TOUGH MUDDER | KR | 1459680 | 8/23/2011 |
| TOUGH MUDDER (MAN W/FLAMES) | KR | A0035007 | 3/29/2013 |
| TOUGH MUDDER HALF (AND DESIGN) | Macau | N/108602 | 7/26/2016 |
| TOUGH MUDDER HALF (AND DESIGN) | Macau | N/108601 | 7/26/2016 |
| TOUGH MUDDER AND DESIGN (MAN W/FLAMES) | Macau | N/108600 | 7/26/2016 |
| TOUGH MUDDER AND DESIGN (MAN W/FLAMES) | Macau | N/108599 | 7/26/2016 |
| TOUGH MUDDER | Macau | N/108597 | 7/26/2016 |
| TOUGH MUDDER | Macau | N/108598 | 7/26/2016 |
| TOUGH MUDDER HALF (AND DESIGN) | Mexico | A0072738 | |
| TOUGH MUDDER RUNNING MAN | Mexico | A0072730 | |
| TOUGH MUDDER | NZ | A0035199 | 4/4/2013 |
| TOUGH MUDDER | NZ | 965352 | 9/12/2012 |
| TOUGH MUDDER AND DESIGN (MAN W/FLAMES) | NZ | 965353 | 9/12/2012 |
| TOUGH MUDDER (MAN W/FLAMES) | Norway | A0035007 | 3/29/2013 |
| TOUGH MUDDER | Norway | 1095812 | 8/23/2011 |
| TOUGH MUDDER | Norway | A0035078 | 4/3/2013 |
| TOUGH MUDDER RUNNING MAN | Norway | A0035199 | 4/10/2013 |
| TOUGH MUDDER LOGO NO FLAMES | Norway | A0035200 | 4/10/2013 |
| TOUGH MUDDER HALF (AND DESIGN) | Oman | A0072730 | |
| TOUGH MUDDER | Oman | A0072738 | |

| Mark Name | Country | Application | Registration |
|---|---|---|---|
| TOUGH MUDDER HALF (AND DESIGN) | Philippines | A0072730 | |
| TOUGH MUDDER LOGO NO FLAMES | Philippines | 4-2016-501680 | 6/16/2016 |
| TOUGH MUDDER | Philippines | 4-2016-501684 | 8/11/2016 |
| TOUGH MUDDER (MAN W/ FLAMES) | Philippines | 4-2016-501681 | 6/10/2016 |
| TOUGH MUDDER RUNNING MAN LOGO | Philippines | 4-2016-501679 | 6/16/2016 |
| TOUGH MUDDER HALF (AND DESIGN) | Singapore | 40201601956W | 6/9/2016 |
| TOUGH MUDDER (MAN W/FLAMES) | Singapore | A0035007 | 3/29/2013 |
| TOUGH MUDDER | Singapore | 1095812 | 8/23/2011 |
| TOUGH MUDDER | Singapore | A0035078 | 4/3/2013 |
| TOUGH MUDDER LOGO NO FLAMES | Singapore | A0035200 | 4/10/2013 |
| TOUGH MUDDER HALF (AND DESIGN) | SA | 2018/01314 | |
| TOUGH MUDDER HALF (AND DESIGN) | SA | 2018/01315 | |
| TOUGH MUDDER | SA | 2013/09853 | 1/30/2015 |
| TOUGH MUDDER | SA | 2013/09854 | 1/30/2015 |
| TOUGH MUDDER (MAN W/FLAMES) | SA | 2013/09855 | 1/30/2015 |
| TOUGH MUDDER (MAN W/FLAMES) | SA | 2013/09856 | 1/30/2015 |
| TOUGH MUDDER (MAN W/FLAMES) | Switzerland | A0035007 | 3/29/2013 |
| TOUGH MUDDER | Switzerland | 1095812 | 8/23/2011 |
| TOUGH MUDDER | Switzerland | A0035078 | 4/3/2013 |
| TOUGH MUDDER RUNNING MAN | Switzerland | A0035199 | 4/10/2013 |
| TOUGH MUDDER LOGO NO FLAMES | Switzerland | A0035200 | 4/10/2013 |
| TOUGH MUDDER | Taiwan | 105011099 | 10/16/2016 |
| TOUGH MUDDER HALF (AND DESIGN) | Taiwan | 105011098 | 10/16/2016 |
| TOUGH MUDDER AND DESIGN (MAN W/FLAMES) | Taiwan | 105011100 | 10/16/2016 |
| تاف مادر مع شعار الرجل الذي يحمل اللهب | UAE | 251873 | 3/13/2014 |
| TOUGH MUDDER AND DESIGN (MAN W/FLAMES) | UAE | 251872 | 3/13/2018 |
| TOUGH MUDDER AND DESIGN (MAN W/FLAMES) | UAE | 251875 | 3/13/2018 |
| TOUGH MUDDER HALF (AND DESIGN) | UAE | 251874 | 3/13/2018 |
| TOUGH MUDDER | UAE | 203084 | 1/18/2016 |
| TOUGH MUDDER BOOTCAMP | UAE | 278407 | |
| TOUGH MUDDER BOOTCAMP | UAE | 278408 | |
| TOUGH MUDDER BOOTCAMP (SHIELD DESIGN) | UAE | 278409 | |
| TOUGH MUDDER BOOTCAMP (SHIELD DESIGN) | UAE | 278410 | |
| TOUGH MUDDER BOOTCAMP (STACKED DESIGN) | UAE | 278411 | |
| TOUGH MUDDER BOOTCAMP (STACKED DESIGN) | UAE | 278412 | |
| MINI MUDDER | UK | 3090375 | 4/24/2015 |
| TOUGH MUDDER HALF (AND DESIGN) | UK | UK00003134617 | 11/4/2015 |
| MISSION: MUDDER | UK | 3218551 | 8/4/2017 |
| ELECTROSHOCK THERAPY | UK | A0035955 | 5/23/2013 |
| ARCTIC ENEMA | UK | A0035958 | 5/23/2013 |
| EVEREST | UK | A0035953 | 5/23/2013 |
| TOUGHER MUDDER | USA | 87/333,713 | 9/18/2018 |
| TOUGHEST MUDDER | USA | 87/271,032 | 2/20/2018 |
| MINI MUDDER | USA | 86/535,541 | 1/19/2016 |
| COLOR ORANGE | USA | 86/189,056 | 1/20/2015 |
| MUDDER'S DAY MADNESS 5K | USA | 86/341,618 | 3/17/2015 |
| TOUGH MUDDER RUNNING MAN LOGO | USA | 85/895,023 | 6/24/2014 |
| MUDDERELLA (DESIGN) | USA | 85/938,041 | 6/17/2014 |
| TOUGH MUDDER (WITHOUT FLAMES) & DESIGN | USA | 85/894,969 | 8/12/2014 |
| TOUGHEST MUDDER LOGO | USA | 87/271,170 | 2/27/2018 |
| URBAN MUDDER (LOGO) | USA | 86/539,576 | 2/23/2016 |
| TOUGH MUDDER HALF (AND DESIGN) | USA | 86/804,465 | 8/14/2018 |

| Mark Name | Country | Application | Registration |
|---|---|---|---|
| TOUGH MUDDER (ORANGE HEADBAND) | USA | 85/896,107 | 11/26/2013 |
| TOUGH MUDDER LOGO (MAN W/FLAMES) | USA | 85/696,468 | 6/17/2014 |
| TOUGH MUDDER LOGO (MAN W/FLAMES) | USA | 85/692,214 | 3/26/2013 |
| CRY BABY | USA | 86/515,713 | 9/1/2015 |
| PROBABLY THE TOUGHEST EVENT ON THE PLANET | USA | 85/401,264 | 4/3/2012 |
| BIRTH CANAL | USA | 86/515,663 | 9/1/2015 |
| THE LIBERATOR | USA | 86/515,698 | 9/1/2015 |
| MUDDER | USA | 85/964,910 | 5/6/2014 |
| 是真汉子 一个可能是这个星球上最难的比赛 | USA | 85/971,721 | 2/18/2014 |
| HANGIN TOUGH | | | |
| ARCTIC ENEMA | USA | 85/715,205 | 3/26/2013 |
| UNDERWATER TUNNELS | USA | 85/715,743 | 5/21/2013 |
| CAGE CRAWL | USA | 85/971,771 | 2/18/2014 |
| GLORY BLADES | USA | 85/971,832 | 2/18/2014 |
| TOUGH MUDDER | USA | 85/889,216 | 1/14/2014 |
| MINI MUDDER | USA | 86/464,578 | 1/10/2017 |
| URBAN MUDDER | USA | 86/315,762 | 12/15/2015 |
| WORLD'S TOUGHEST MUDDER | USA | 86/401,350 | 6/30/2015 |
| MUDDER LEGION | USA | 86/262,485 | 9/15/2015 |
| TRENCH WARFARE | USA | 85/715,301 | 6/4/2013 |
| FUNKY MONKEY | USA | 85/715,629 | 5/21/2013 |
| MUDDER NATION | USA | 85/575,337 | 11/13/2012 |
| KISS OF MUD | USA | 85/403,646 | 4/24/2012 |
| EVEREST | USA | 85/715,591 | 4/2/2013 |
| THE HANGOVER | USA | 86/515,740 | 10/6/2015 |
| MUDDERELLA | USA | 85/897,953 | 6/17/2014 |
| OWN YOUR STRONG | USA | 85/938,075 | 6/17/2014 |
| ELECTROSHOCK THERAPY | USA | 85/715,623 | 3/26/2013 |
| RINSE + REVIVE | USA | 85/938,097 | 7/22/2014 |
| BERLINS WALLS | USA | 85/715,802 | 4/23/2013 |
| TOUGH MUDDER | USA | 77/862,682 | 6/29/2010 |
| KING OF THE SWINGERS | USA | 86/515,688 | 9/1/2015 |
| HOLD YOUR WOOD | USA | 85/403,562 | 5/1/2012 |
| TOUGH MUDDER LOGO (MAN W/FLAMES) | USA | 85/407,879 | 4/24/2012 |
| WORLD'S TOUGHEST MUDDER (AND DESIGN) | USA | 87/475,050 | 11/7/2017 |

| Domain Registrar | Domain Name |
|---|---|
| https://my.101domain.com | BIGMUDDER.CA |
| https://my.101domain.com | BIGMUDDER.CH |
| https://my.101domain.com | BIGMUDDER.CO |
| https://my.101domain.com | BIGMUDDER.CO.NZ |
| https://my.101domain.com | bigmudder.co.uk |
| https://my.101domain.com | bigmudder.com |
| https://my.101domain.com | BIGMUDDER.COM.AU |
| https://my.101domain.com | BIGMUDDER.ES |
| https://my.101domain.com | bigmudder.eu |
| https://my.101domain.com | BIGMUDDER.INFO |
| https://my.101domain.com | BIGMUDDER.JP |
| https://my.101domain.com | BIGMUDDER.MX |
| https://my.101domain.com | BIGMUDDER.NL |
| https://my.101domain.com | BIGMUDDER.PE |
| https://my.101domain.com | BIGMUDDER.PRO |
| https://my.101domain.com | BIGMUDDER.US |
| https://my.101domain.com | BIGMUDDER.US.COM |
| https://my.101domain.com | BIGMUDDER.XXX |
| https://my.101domain.com | BIGMUDDERFOUNDATION.COM |
| https://my.101domain.com | BIGMUDDERFOUNDATION.ORG |
| https://my.101domain.com | celebritytoughmudder.com |
| https://my.101domain.com | championmudder.com |
| https://my.101domain.com | fiercemudder.com |
| https://my.101domain.com | halfmudder.co.uk |
| https://my.101domain.com | halfmudder.com.au |
| https://my.101domain.com | halfmudder.de |
| https://my.101domain.com | halfmudder.com |
| https://my.101domain.com | lilmudder.com |
| https://my.101domain.com | live-tough.com |
| https://my.101domain.com | livetough.com |
| https://my.101domain.com | marathonmudder.com |
| https://my.101domain.com | metromudder.com |
| https://my.101domain.com | mightymudder.com |
| https://my.101domain.com | millionmudders.com |
| https://my.101domain.com | MUD-MOISELLE.ASIA |
| https://my.101domain.com | MUD-MOISELLE.CH |

| Domain Registrar | Domain Name |
|---|---|
| https://my.101domain.com | mudderangels.co.uk |
| https://my.101domain.com | mudderangels.com |
| https://my.101domain.com | mudderangels.net |
| https://my.101domain.com | mudderangels.org |
| https://my.101domain.com | mudderchallenge.com |
| https://my.101domain.com | mudderchallenge.de |
| https://my.101domain.com | MUDDERELLA.ASIA |
| https://my.101domain.com | MUDDERELLA.CH |
| https://my.101domain.com | MUDDERELLA.COM |
| https://my.101domain.com | MUDDERELLA.COM.AU |
| https://my.101domain.com | MUDDERELLA.IT |
| https://my.101domain.com | MUDDERELLA.PT |
| https://my.101domain.com | MUDDERELLA.VN |
| https://my.101domain.com | MUDDERISTA.ASIA |
| https://my.101domain.com | MUDDERISTA.CH |
| https://my.101domain.com | mudderlegion.com |
| https://my.101domain.com | muddernation.com |
| https://my.101domain.com | MUDERELLA.ASIA |
| https://my.101domain.com | MUDERELLA.CA |
| https://my.101domain.com | MUDERELLA.CH |
| https://my.101domain.com | MUDERELLA.CO.UK |
| https://my.101domain.com | MUDERELLA.COM |
| https://my.101domain.com | MUDERELLA.COM.AU |
| https://my.101domain.com | MUDERELLA.US |
| https://my.101domain.com | MUDERISTA.ASIA |
| https://my.101domain.com | MUDERISTA.CH |
| https://my.101domain.com | MUDERISTA.VN |
| https://my.101domain.com | MUDMOISELLE.ASIA |
| https://my.101domain.com | MUDMOISELLE.CH |
| https://my.101domain.com | mudwarriorchallenge.com |
| https://my.101domain.com | nightmudder.com |
| https://my.101domain.com | nightmudder.co.uk |
| https://my.101domain.com | nightmudder.com.au |
| https://my.101domain.com | onemillionmudders.com |
| http://www.networksolutions.com/ | powermudder.com |
| http://www.networksolutions.com/ | primalmudder.com |

| Domain Registrar | Domain Name |
|---|---|
| http://www.networksolutions.com/ | rebelmudder.com |
| https://my.101domain.com | robinhoodtoughmudder.com |
| http://www.networksolutions.com/ | roughmudder.com |
| http://www.networksolutions.com/ | ruckusmudder.com |
| http://www.networksolutions.com/ | ruggedmudder.com |
| http://www.networksolutions.com/ | savagemudder.com |
| http://www.networksolutions.com/ | shopmudderella.com |
| https://www.melbourneit.com.au/ | softmudder.com |
| http://www.networksolutions.com/ | spartanmudder.com |
| http://www.networksolutions.com/ | strongmudder.com |
| http://www.networksolutions.com/ | survivalmudder.com |
| https://my.101domain.com | theminimudder.com |
| https://my.101domain.com | tmhq.com |
| https://my.101domain.com | tmhqalumni.com |
| https://my.101domain.com | tmhqonline.com |
| https://my.101domain.com | tough-challenge.at |
| https://my.101domain.com | tough-challenge.be |
| https://my.101domain.com | tough-challenge.co.nz |
| GoDaddy.com | tough-challenge.co.uk |
| https://my.101domain.com | TOUGH-CHALLENGE.CO.ZA |
| https://my.101domain.com | tough-challenge.com |
| https://my.101domain.com | tough-challenge.com.au |
| GoDaddy.com | tough-challenge.de |
| GoDaddy.com | tough-challenge.es |
| GoDaddy.com | tough-challenge.fr |
| GoDaddy.com | tough-challenge.it |
| https://my.101domain.com | tough-challenge.nl |
| https://my.101domain.com | tough-challenge.se |
| https://my.101domain.com | TOUGH-CHALLENGE.SG |
| https://my.101domain.com | TOUGH-MUDDER.COM |
| https://my.101domain.com | toughestmudder.com |
| https://my.101domain.com | toughestmudder.co.uk |
| https://my.101domain.com | toughestmudder.com.au |
| https://my.101domain.com | toughestmudder.de |
| https://my.101domain.com | TOUGHMUDDER.AE |
| https://my.101domain.com | toughmudder.asia |

| Domain Registrar | Domain Name |
|---|---|
| https://my.101domain.com | toughmudder.be |
| http://www.networksolutions.com/ | toughmudder.biz |
| http://www.networksolutions.com/ | toughmudder.bz |
| https://my.101domain.com | toughmudder.ca |
| http://www.networksolutions.com/ | toughmudder.cc |
| https://my.101domain.com | toughmudder.ch |
| https://my.101domain.com | toughmudder.co |
| https://my.101domain.com | toughmudder.co.nz |
| https://my.101domain.com | toughmudderhalf.co.nz |
| http://www.names.co.uk/ | toughmudder.co.uk |
| https://my.101domain.com | toughmudder.co.uk |
| https://www.melbourneit.com.au/ | toughmudder.com |
| https://my.101domain.com | toughmudder.com.au |
| https://my.101domain.com | toughmudder.com.mx |
| https://my.101domain.com | toughmudder.cz |
| https://my.101domain.com | toughmudder.de |
| https://my.101domain.com | toughmudder.es |
| https://my.101domain.com | TOUGHMUDDER.FI |
| GoDaddy.com | toughmudder.fr |
| https://my.101domain.com | TOUGHMUDDER.HK |
| https://my.101domain.com | toughmudder.id |
| https://my.101domain.com | toughmudder.ie |
| http://www.networksolutions.com/ | toughmudder.info |
| https://my.101domain.com | toughmudder.kr |
| http://www.networksolutions.com/ | toughmudder.me |
| http://www.networksolutions.com/ | toughmudder.mobi |
| https://my.101domain.com | toughmudder.mx |
| http://www.networksolutions.com/ | toughmudder.name |
| https://my.101domain.com | toughmudder.net |
| https://my.101domain.com | toughmudder.nl |
| https://my.101domain.com | toughmudder.org |
| http://www.networksolutions.com/ | toughmudder.pro |
| https://my.101domain.com | toughmudder.sg |
| http://www.networksolutions.com/ | toughmudder.tel |
| http://www.networksolutions.com/ | toughmudder.tv |

| Domain Registrar | Domain Name |
|---|---|
| http://www.networksolutions.com/ | toughmudder.us |
| http://www.networksolutions.com/ | toughmudder.us.com |
| http://www.networksolutions.com/ | toughmudder.xxx |
| http://www.networksolutions.com/ | toughmudder.xyz |
| https://my.101domain.com | TOUGHMUDDERALUMNI.COM |
| https://my.101domain.com | toughmudderchina.com |
| https://my.101domain.com | toughmudderclothes.com |
| https://my.101domain.com | toughmudderdev.com |
| http://www.networksolutions.com/ | toughmudderfoundation.org |
| https://my.101domain.com | toughmuddergear.ca |
| GoDaddy.com | toughmuddergear.com |
| https://my.101domain.com | toughmuddergear.com.au |
| https://my.101domain.com | toughmuddergear.de |
| https://my.101domain.com | toughmuddergears.com.au |
| https://my.101domain.com | toughmudderhalf.co |
| https://my.101domain.com | toughmudderhalf.co.uk |
| https://my.101domain.com | toughmudderhalf.com |
| https://my.101domain.com | toughmudderhalf.com.au |
| https://my.101domain.com | toughmudderhalf.mx |
| https://my.101domain.com | toughmudderhalf.net |
| https://my.101domain.com | toughmudderhalf.nz |
| https://my.101domain.com | toughmuddermechanics.com |
| https://my.101domain.com | toughmudderphotos.com |
| https://my.101domain.com | toughmudderrobinhood.com |
| https://my.101domain.com | toughmuddershop.com.au |
| https://my.101domain.com | toughmudderstore.co.uk |
| http://www.networksolutions.com/ | toughmudderstore.com |
| http://www.networksolutions.com/ | toughmuddersupport.com |
| https://my.101domain.com | toughmudderteamgear.com |
| http://www.networksolutions.com/ | toughmudderteamshirts.com |
| https://www.melbourneit.com.au/ | toughmuddertv.com |
| http://www.networksolutions.com/ | toughmudderventures.com |
| https://my.101domain.com | toughmudderwear.com |
| https://www.melbourneit.com.au/ | tuffmudder.com |
| https://my.101domain.com | urbanmudder.ca |
| https://my.101domain.com | urbanmudder.co.uk |

| Domain Registrar | Domain Name |
|---|---|
| https://my.101domain.com | urbanmudder.com |
| https://my.101domain.com | urbanmudder.com.au |
| http://www.networksolutions.com/ | warriormudder.com |
| https://www.melbourneit.com.au/ | worldstoughestmudder.com |
| http://www.networksolutions.com/ | worldstoughestmudder.tv |
| https://www.melbourneit.com.au/ | worldstoughestmuddertv.com |
| http://www.networksolutions.com/ | yoursaturdayisajoke.com |
| www.corsearchdomains.com | toughmudder.cn |
| https://my.101domain.com | americastoughestmudder.com |
| https://my.101domain.com | canadastoughestmudder.com |
| https://my.101domain.com | europestoughestmudder.com |
| https://my.101domain.com | europestoughestmudder.co.uk |
| https://domains.google.com | toughmudderbootcampfranchising.com |

## Schedule 2.1.7 - Tangible Personal Property

| Asset ID | Location of Assets | Description of Assets |
|---|---|---|
| Tough Mudder Warehouse | Carrie Steempin<br>c/o Materialogic<br>3100 Corporate Exchange Ct,<br>Bridgeton, MO 63044 | All Tough Mudder inventory, including shirts, headbands, consumable event supplies, signage, banners, decor items, and other materials under TM's contract with Materialogic. |
| West Coast Obstacle Kit | Lake Las Vegas Association<br>Attn: President<br>2030 Lake Las Vegas Parkway, Henderson, NV | Seller's Obstacle course components under the supervision of Trademac Associates, stored at the 2019 Tough Mudder Las Vegas venue. |
| West Coast Obstacle Kit | Gary Brewer<br>Trademarc Associates<br>880 Cara Court, Bangor, PA | Seller's Obstacle course components in the possession of Trademac Associates, stored in their facility. |
| Mid-West Obstacle Kit | Stored at: Clear Springs Ranch • 5020 Cox Rd. Bartow, FL  33830;<br><br>Mailing Address: Patrick Carroll, 6105 Spirit Lake Road, Winter Haven, FL 33880 | Seller's Obstacle course components in the supervision of David Watkins Homes, located at the previous Dec 2019 venue in Central Florida. |
| East Coast Obstacle Kit | Hugh Lochore<br>Bouckaert Farms,<br>9445 Browns Lake Rd;<br>Fairburn, Georgia 30213; | Seller's Obstacle course components under the supervision of Valley Builders, stored at the 2019 Tough Mudder Atlanta event Bouckaert Farms venue. |
| East Coast Obstacle Kit | William Wall<br>Valley Builders<br>775 Furnace St,<br>Emmaus, PA 18049 | Seller's Obstacle course components in the possession of Valley Builders, stored in their facility in Emmaus, PA. |
| West Coast Event Trailers | Gale Powers<br>ISM Raceway,<br>7602 S Avondale Blvd,<br>Avondale, AZ 85323 | Event kit materials stored in four Ryder leased trailers, including durable goods and expendable inventory. |
| East Coast Event Trailers | Stored at: Clear Springs Ranch • 5020 Cox Rd. Bartow, FL  33830;<br><br>Mailing Address: Patrick Carroll, 6105 Spirit Lake Road, Winter Haven, FL 33880 | Event kit materials stored in four Ryder leased trailers, including durable goods and expendable inventory. |
| Office Inventory | Tough Mudder Offices<br>15 Metrotech Center,<br>7th & 8th Floor, Brooklyn, NY | All computers, paper files, branded apparel and other promotional goods, owned printers and IT equipment, video production equipment and cameras, tools, and event materials. Specifically excludes furnishings, gym equipment and office decor. |
| Wuxi Mayshee Order | Jessica Wee<br>Wuxi Mayshee Developing Company<br>jessicawee@mayshee.cn | Global headband and other consumable item order. Purchase order issued but not yet paid for. |

**EXHIBIT A**

**FORM OF BILL OF SALE**

**BILL OF SALE**

This BILL OF SALE (this "Bill of Sale"), is executed and delivered as of [February __], 2020, by Derek C. Abbott, not individually, but solely in his capacity as chapter 11 trustee (the "Trustee" or "Seller") of the bankruptcy estate of Tough Mudder Incorporated and Tough Mudder Event Production Incorporated to Spartan Race, Inc., a Delaware corporation ("Buyer").

WHEREAS, on the terms and subject to the conditions of the Asset Purchase Agreement, dated as [February 3,], 2020, by and between Buyer and Seller (as modified, amended, or supplemented, the "Asset Purchase Agreement"), Seller agreed to, on the Closing Date, sell, convey, transfer, assign, and deliver to Buyer the Acquired Assets free and clear of all Encumbrances.

NOW, THEREFORE, for the consideration set forth in the Asset Purchase Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged:

1.     Defined Terms. All initially capitalized terms used but not defined herein have the meaning ascribed to such terms in the Asset Purchase Agreement.

2.     Transfer of Acquired Assets. On the terms and subject to the conditions set forth in the Asset Purchase Agreement, Seller hereby sells, conveys, transfers, assigns, and delivers to Buyer, and Buyer's successors and assigns, all of the right, title, and interest of Seller in and to the Acquired Assets owned by Seller free and clear of all Encumbrances.

3.     As-Is, Where-Is. Except as set forth in the Asset Purchase Agreement, the Acquired Assets are being sold, conveyed, transferred, assigned, and delivered hereunder "AS-IS", "WHERE-IS", and "Quit Claim" basis, and Seller does not make any express or implied representations, statements, warranties or conditions of any kind or nature whatsoever concerning the Acquired Assets being sold, conveyed, transferred, assigned and delivered hereunder.

4.     Asset Purchase Agreement. No provision of this Bill of Sale shall in any way amend any of the express provisions (including the warranties, covenants, agreements, conditions, representations and obligations and indemnifications, and the limitations related thereto, of Seller or Buyer) set forth in the Asset Purchase Agreement, this Bill of Sale being intended solely to effect the transfer of the Acquired Assets. In the event that any provision of this Bill of Sale is construed to conflict with a provision in the Asset Purchase Agreement, the provision in the Asset Purchase Agreement shall be deemed to be controlling.

5.     Further Assurances. If Buyer shall consider or be advised that any deeds, bills of sale, instruments of conveyance, assignments, assurances, or any other actions or things are necessary or desirable to vest, perfect, or confirm ownership (of record or otherwise) in Buyer, Buyer's right, title, or interest in, to, or under any or all of the Acquired Assets transferred and conveyed by Seller hereunder, Seller shall execute and deliver all deeds, bills of sale, instruments

of conveyance, powers of attorney, assignments, and assurances and take and do all such other actions and things as may be reasonably requested by Buyer in order to vest, perfect, or confirm any and all right, title, and interest in, to, and under such rights, properties, or assets in Buyer, in each case at Buyer's cost and expense.

6.    <u>Binding on Successors; No Third Party Beneficiaries</u>.  This Bill of Sale shall be binding upon and inure to the benefit of the parties hereto and the successors in interest and permitted assigns of such parties.  This Bill of Sale is not intended to confer any rights or remedies upon any Person other than the parties hereto.

7.    <u>Counterparts</u>.  This Bill of Sale may be executed in two (2) or more counterparts (including by facsimile or by an electronic scan delivered by electronic mail), each of which shall be deemed an original but all of which together shall be considered one and the same agreement and shall become effective when counterparts have been signed by each party hereto and delivered to the other parties, it being understood that each party need not sign the same counterpart.  This Bill of Sale may be executed and delivered by an electronic scan delivered by electronic mail.  No party shall assert that the use of a facsimile machine or electronic transmission to deliver a signature or the fact that any signature was transmitted or communicated through the use of a facsimile machine or electronic transmission, constitutes a defense to the formation or delivery of a contract or a document, and each party hereto forever waives any such defenses.

8.    <u>Governing Law</u>.  THIS BILL OF SALE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL BANKRUPTCY LAW, TO THE EXTENT APPLICABLE, AND WHERE STATE LAW IS IMPLICATED THIS BILL OF SALE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF, INCLUDING AS TO MATTERS OF CONSTRUCTION, VALIDITY, AND PERFORMANCE.

9.    <u>Bankruptcy Court Jurisdiction</u>.  BUYER AND SELLER AGREE THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER ALL DISPUTES AND OTHER MATTERS RELATING TO (i) THE INTERPRETATION AND ENFORCEMENT OF THIS BILL OF SALE OR ANY ANCILLARY DOCUMENT EXECUTED PURSUANT TO THIS BILL OF SALE; OR (ii) THE ACQUIRED ASSETS AND ASSUMED LIABILITIES ASSUMED PURSUANT TO OR ARISING OUT OF THIS BILL OF SALE OR ANY ANCILLARY DOCUMENT EXECUTED PURSUANT TO THIS BILL OF SALE, AND BUYER EXPRESSLY CONSENTS TO AND AGREES NOT TO CONTEST SUCH EXCLUSIVE JURISDICTION; <u>PROVIDED</u> THAT IF THE BANKRUPTCY COURT IS UNWILLING OR UNABLE TO HEAR ANY SUCH DISPUTES AND OTHER MATTERS, THEN THE COURTS OF THE STATE OF DELAWARE, SITTING IN NEW CASTLE COUNTY, AND THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA SITTING IN THE STATE OF DELAWARE SHALL HAVE EXCLUSIVE JURISDICTION OVER SUCH DISPUTES AND OTHER MATTERS EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS BILL OF SALE OR THE TRANSACTIONS CONTEMPLATED HEREBY.

IN WITNESS WHEREOF, the party hereto has executed this Bill of Sale as of the day and year first above written.

**SELLER**:

DEREK C. ABBOTT, NOT INDIVIDUALLY, BUT SOLELY IN HIS CAPACITY AS CHAPTER 11 TRUSTEE OF THE BANKRUPTCY ESTATE OF TOUGH MUDDER INCORPORATED AND TOUGH MUDDER EVENT PRODUCTION INCORPORATED

By:_____
Name:  Derek C. Abbott, Chapter 11 Trustee

**EXHIBIT B**

**ASSIGNMENT AND ASSUMPTION AGREEMENT**

This ASSIGNMENT AND ASSUMPTION AGREEMENT (this "<u>Agreement</u>") is executed and delivered as of [February __], 2020, by and between Derek C. Abbott, not individually, but solely in his capacity as chapter 11 trustee (the "<u>Trustee</u>" or "<u>Seller</u>") of the bankruptcy estate of Tough Mudder Incorporated and Tough Mudder Event Production Incorporated to Spartan Race, Inc., a Delaware corporation ("<u>Buyer</u>"), pursuant to the Asset Purchase Agreement (as hereinafter defined).

WHEREAS, on the terms and subject to the conditions of the Asset Purchase Agreement, dated as [February 3], 2020, by and between Buyer and Seller (as modified, amended, or supplemented, the "<u>Asset Purchase Agreement</u>"), Seller agreed to, on the Closing Date, sell, convey, transfer, assign, and deliver to Buyer the Acquired Assets free and clear of all Encumbrances.

NOW, THEREFORE, for the consideration set forth in the Asset Purchase Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

1.    <u>Defined Terms</u>.  All initially capitalized terms used but not defined herein have the meaning given them in the Asset Purchase Agreement.

2.    <u>Assignment of Assumed Contracts</u>.  On the terms and subject to the conditions set forth in the Asset Purchase Agreement, Seller hereby sells, conveys, transfers, assigns, and delivers to Buyer, and Buyer's successors and assigns, all right, title and interest of Seller in and to (a) the Assumed Contracts set forth on attached <u>Exhibit A</u>.

3.    <u>Assumption of Assumed Liabilities</u>.  On the terms and subject to the conditions set forth in the Asset Purchase Agreement, Buyer hereby assumes and agrees to discharge or perform when due (in accordance with the terms and conditions of the Assumed Contracts), the Assumed Contracts and all other liabilities of Seller that constitute Assumed Liabilities.  Other than the obligations under the Assumed Contracts and the other liabilities of Seller that constitute Assumed Liabilities, Buyer has not assumed any liability of any nature or kind whatsoever of Seller.

4.    <u>Asset Purchase Agreement</u>.  This Agreement is in accordance with and is subject to the terms of the Asset Purchase Agreement.  Nothing contained herein shall be deemed to supersede, enlarge on or modify any of the obligations, agreements, covenants or warranties of Seller contained in the Asset Purchase Agreement.  If any conflict or other difference exists between the terms of this Agreement and the Asset Purchase Agreement, then the terms of the Asset Purchase Agreement shall govern and control.  Except as set forth in the Asset Purchase Agreement, the Assumed Contracts and Assumed Liabilities are being assigned and delivered hereunder "AS-IS", "WHERE-IS", and Seller does not make any express or implied representations, statements, warranties or conditions of any kind or nature whatsoever concerning the Assumed Contracts and Assumed Liabilities being assumed.

5.      Binding on Successors; No Third Party Beneficiaries.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and the respective successors in interest and permitted assigns of such parties.  This Agreement is not intended to confer any rights or remedies upon any person or entity other than the parties hereto.

6.      Counterparts.  This Agreement may be executed in two (2) or more counterparts (including by facsimile or by an electronic scan delivered by electronic mail), each of which shall be deemed an original but all of which together shall be considered one and the same agreement and shall become effective when counterparts have been signed by each party hereto and delivered to the other parties, it being understood that each party need not sign the same counterpart.  This Agreement may be executed and delivered by an electronic scan delivered by electronic mail.  No party shall assert that the use of a facsimile machine or electronic transmission to deliver a signature or the fact that any signature was transmitted or communicated through the use of a facsimile machine or electronic transmission, constitutes a defense to the formation or delivery of a contract or a document, and each party hereto forever waives any such defenses.

7.      Severability.  If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect.  Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

8.      Amendments, Etc.  Any amendment, modification or waiver of any term or provision of this Agreement must be in writing and signed by Seller and Buyer.  Any waiver will be effective only in the specific instance and for the specific purpose for which it is given.

9.      Governing Law.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL BANKRUPTCY LAW, TO THE EXTENT APPLICABLE, AND WHERE STATE LAW IS IMPLICATED THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF, INCLUDING AS TO MATTERS OF CONSTRUCTION, VALIDITY, AND PERFORMANCE.

10.      Bankruptcy Court Jurisdiction.  BUYER AND SELLER AGREE THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER ALL DISPUTES AND OTHER MATTERS RELATING TO (i) THE INTERPRETATION AND ENFORCEMENT OF THIS AGREEMENT OR ANY ANCILLARY DOCUMENT EXECUTED PURSUANT TO THIS AGREEMENT; OR (ii) THE ACQUIRED ASSETS AND ASSUMED LIABILITIES ASSUMED PURSUANT TO OR ARISING OUT OF THIS AGREEMENT OR ANY ANCILLARY DOCUMENT EXECUTED PURSUANT TO THIS AGREEMENT, AND BUYER EXPRESSLY CONSENTS TO AND AGREES NOT TO CONTEST SUCH EXCLUSIVE JURISDICTION; PROVIDED THAT IF THE BANKRUPTCY COURT IS UNWILLING OR UNABLE TO HEAR ANY SUCH DISPUTES AND OTHER MATTERS, THEN THE COURTS OF THE STATE OF DELAWARE, SITTING IN NEW CASTLE COUNTY, AND THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA SITTING IN THE STATE OF DELAWARE SHALL HAVE EXCLUSIVE JURISDICTION OVER SUCH DISPUTES AND OTHER MATTERS EACH OF THE PARTIES HERETO

HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the undersigned parties hereby execute this Agreement as of the day and year first above written.

**BUYER**:

SPARTAN RACE, INC.

By: _____
Name:  David Piperno
Title:  Chief Financial Officer

**SELLER**:

DEREK C. ABBOTT, NOT INDIVIDUALLY,
BUT SOLELY IN HIS CAPACITY AS CHAPTER
11 TRUSTEE OF THE BANKRUPTCY ESTATE
OF TOUGH MUDDER INCORPORATED AND
TOUGH MUDDER EVENT PRODUCTION
INCORPORATED

By:_____
Name:  Derek C. Abbott, Chapter 11 Trustee

Exhibit A

Assumed Contracts

Assumed Events

**EXHIBIT C**

**INTELLECTUAL PROPERTY ASSIGNMENT AND ASSUMPTION AGREEMENT**

This INTELLECTUAL PROPERTY ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement"), is executed and delivered as of [February __], 2020, by and between Derek C. Abbott, not individually, but solely in his capacity as chapter 11 trustee (the "Trustee" or "Seller") of the bankruptcy estate of Tough Mudder Incorporated and Tough Mudder Event Production Incorporated (the "Debtor"), to Spartan Race, Inc., a Delaware corporation ("Buyer"), pursuant to the Asset Purchase Agreement (as hereinafter defined).

WHEREAS, on the terms and subject to the conditions of the Asset Purchase Agreement, dated as [February 3], 2020, by and between Buyer and Seller (as modified, amended, or supplemented, the "Asset Purchase Agreement"), Seller agreed to, on the Closing Date, sell, convey, transfer, assign, and deliver to Buyer the Acquired Assets free and clear of all Encumbrances;

WHEREAS, the Debtor is the owner of each of the Intellectual Property Assets set forth on Schedule A hereto (the "Purchased Intellectual Property"); and

NOW, THEREFORE, for the consideration set forth in the Asset Purchase Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

1.    Defined Terms. All initially capitalized terms used but not defined herein have the meaning given them in the Asset Purchase Agreement.

2.    Assignment. On the terms and subject to the conditions set forth in the Asset Purchase Agreement, Seller hereby sells, conveys, transfers, assigns, and delivers to Buyer, and Buyer's successors and assigns,

i)    all right, title and interest of the Debtor in and to the Purchased Intellectual Property, including all rights therein provided by international conventions and treaties, and the right to sue for past, present and future infringement thereof ("Transferred Rights");

ii)    any and all rights to sue at law or in equity for any infringement, imitation, impairment, distortion, dilution or other unauthorized use or conduct in derogation of the Transferred Rights occurring prior to the Closing, including the right to receive all proceeds and damages therefrom;

iii)    any and all rights to royalties, profits, compensation, license fees or other payments or remuneration of any kind relating to the Transferred Rights arising from and after the date of this Agreement; and

iv)    any and all rights to obtain renewals, reissues, and extensions of registrations or other legal protections pertaining to the Transferred Rights.

Exhibit C – Page 1

Buyer, its successors and assigns, shall hold the rights to the foregoing for and during the existence of such Transferred Rights, and all renewals, reissues and extensions thereof, as fully and as entirely as the same would have been held and enjoyed by Debtor had this Agreement not been made.

3.    Asset Purchase Agreement.  This Agreement is in accordance with and is subject to the terms of the Asset Purchase Agreement.  Nothing contained herein shall be deemed to supersede, enlarge on or modify any of the obligations, agreements, covenants or warranties of Seller contained in the Asset Purchase Agreement.  If any conflict or other difference exists between the terms of this Agreement and the Asset Purchase Agreement, then the terms of the Asset Purchase Agreement shall govern and control.  Except as set forth in the Asset Purchase Agreement, the Transferred Rights are being sold, conveyed, transferred, assigned and delivered hereunder "AS-IS", "WHERE-IS", and Seller does not make any express or implied representations, statements, warranties or conditions of any kind or nature whatsoever concerning the Transferred Rights being sold, conveyed, transferred, assigned and delivered hereunder.

4.    Further Assurances.  Seller shall, at the cost and expense of Buyer, timely execute and deliver any additional documents and perform such additional acts reasonably necessary or desirable to record and perfect the interest of Buyer in and to the Purchased Intellectual Property, and shall not enter into any agreement in conflict with this Agreement.

5.    Binding on Successors; No Third Party Beneficiaries.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and the respective successors in interest and permitted assigns of such parties.  This Agreement is not intended to confer any rights or remedies upon any person or entity other than the parties hereto.

6.    Counterparts.  This Agreement may be executed in two (2) or more counterparts (including by facsimile or by an electronic scan delivered by electronic mail), each of which shall be deemed an original but all of which together shall be considered one and the same agreement and shall become effective when counterparts have been signed by each party hereto and delivered to the other parties, it being understood that each party need not sign the same counterpart.  This Agreement may be executed and delivered by an electronic scan delivered by electronic mail.  No party shall assert that the use of a facsimile machine or electronic transmission to deliver a signature or the fact that any signature was transmitted or communicated through the use of a facsimile machine or electronic transmission, constitutes a defense to the formation or delivery of a contract or a document, and each party hereto forever waives any such defenses.

7.    Severability.  If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect.  Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

8.    Amendments, Etc.  Any amendment, modification or waiver of any term or provision of this Agreement must be in writing and signed by Seller and Buyer.  Any waiver will be effective only in the specific instance and for the specific purpose for which it is given.

Exhibit C – Page 2

9.    Governing Law.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL BANKRUPTCY LAW, TO THE EXTENT APPLICABLE, AND WHERE STATE LAW IS IMPLICATED THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF, INCLUDING AS TO MATTERS OF CONSTRUCTION, VALIDITY, AND PERFORMANCE.

10.    Bankruptcy Court Jurisdiction.  BUYER AND SELLER AGREE THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER ALL DISPUTES AND OTHER MATTERS RELATING TO (i) THE INTERPRETATION AND ENFORCEMENT OF THIS AGREEMENT OR ANY ANCILLARY DOCUMENT EXECUTED PURSUANT TO THIS AGREEMENT; OR (ii) THE ACQUIRED ASSETS AND ASSUMED LIABILITIES ASSUMED PURSUANT TO OR ARISING OUT OF THIS AGREEMENT OR ANY ANCILLARY DOCUMENT EXECUTED PURSUANT TO THIS AGREEMENT, AND BUYER EXPRESSLY CONSENTS TO AND AGREES NOT TO CONTEST SUCH EXCLUSIVE JURISDICTION; PROVIDED THAT IF THE BANKRUPTCY COURT IS UNWILLING OR UNABLE TO HEAR ANY SUCH DISPUTES AND OTHER MATTERS, THEN THE COURTS OF THE STATE OF DELAWARE, SITTING IN NEW CASTLE COUNTY, AND THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA SITTING IN THE STATE OF DELAWARE SHALL HAVE EXCLUSIVE JURISDICTION OVER SUCH DISPUTES AND OTHER MATTERS EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

*[Signature Page Follows]*

Exhibit C – Page 3

IN WITNESS WHEREOF, the undersigned parties hereby execute this Agreement as of the day and year first above written.

**BUYER**:

SPARTAN RACE, INC.

By: _____
Name:  David Piperno
Title:  Chief Financial Officer

**SELLER**:

DEREK C. ABBOTT, NOT INDIVIDUALLY, BUT SOLELY IN HIS CAPACITY AS CHAPTER 11 TRUSTEE OF THE BANKRUPTCY ESTATE OF TOUGH MUDDER INCORPORATED AND TOUGH MUDDER EVENT PRODUCTION INCORPORATED

By:_____
Name:  Derek C. Abbott, Chapter 11 Trustee

Exhibit C – Page 1

**EXHIBIT B**

**Schedule 1.1.10 - Assumed Contracts**

| Contract Type | Contract Name | Counterparty Address | Counterparty Contact Name | Effective Date | Cure Claims |
|---|---|---|---|---|---|
| Vendor / Service Provider | Diffusion | 244 5th avenue New York, NY 10001 | Liz Duggan | 11/01/2019 | $16,001 |
| Software License | IBM/Silverpop | 3 east 28th street New York, NY 10016 | Mark Hetterly | 10/01/2019 | $36,213 |
| Vendor / Service Provider | Pantheon | 717 California Street San Francisco CA 94108 | Job Gregory | 11/01/2019 | $13,256.69 |
| Vendor / Service Provider | Wondersauce | 45 West 25th Street, 6th Floor New York, NY 10010 | Megan Blake | 5/16/2019 | $50,000 |
| Software License | One Trust | 1200 Abernathy Rd NE, Building 600 Atlanta, Georgia 30328 | Steve Rubenstein | 6/18/2019 | $6,336.00 |
| Software License | Bynder | Subscription Service | N/A | 4/3/2019 | Unk, Credit Card |
| Software License | AWS | Subscription Service | N/A | Monthly subscription | $3,000 |
| Software License | Github | Subscription Service | N/A | Monthly subscription | $100, on credit card |
| Software License | Cloudingo | Subscription Service | N/A | April 2019 | $0 |
| Vendor / Service Provider | Materialogic | Materialogic 3100 Corporate Exchange Ct, Bridgeton, MO 63044 | A. Milton Cornwell | 1/1/2014 | $27,094.47 |
| Vendor / Service Provider | Ryder Leasing | Ryder Shared Services Center - Customer Care, 6000 Windward Pkwy, Alpharetta, GA 30005. | Rental Agreement #'s: 00707765 00731074 00731478 00733093 00733094 00733096 00733097 00733098 00733194 | Various, rental agreements | $0 |
| Software License | Rosterfy | 2420 17th Street Tenant LLC 2420 17th St Denver, CO 80202 | Shannon Gove | Quarterly subscription | $2,876.45 |
| Vendor / Service Provider | Dyehard Fan Supply | Dyehard Fan Supply 1001 West Fourth Street Winstom-Salem, NC 27101 | Scott Killian | 1/1/2018, Amended for 1/1/2020 | $0 |
| Software License | G-Suite | Subscription Service | N/A | June 2019 | $0 |
| Licensee | Tough Mudder Bootcamp | TM Bootcamp c/o John M. Cross, Jr. Brooks Pierce 2000 Renaissance Plaza 230 North Elm Street Greensboro, N.C. 27401 | Britt Canady / John Cross | 5/25/19 | $0 |
| Sponsor / Revenue / Comm. Support | EveryManJack | Every Man Jack 500 Tamal Plaza Suite 505 Corte Madera, CA 94925 | Ritch Viola | 1/1/2019 | $0 |
| Sponsor / Revenue / Comm. Support | Navy Federal Credit Union | Navy Federal Credit Union 820 Follin Lane Vienna, VA 22180 | Patty Valezuela Stover | 1/1/2019 | $0 |
| Sponsor / Revenue / Comm. Support | EventHub | Event Hub 6523 California Avenue, Suite 148, Seattle, WA 98136 | Michael Bleu | 10/2019 | $0 |
| Licensee | IMG (Australia) | IMG Level 8 580 St. Kilda Road Melbourne, Victoria, Australia | Marcus Gale | 1/1/19 | $635.00 |
| Licensee | Runireland (Ireland) | Runireland Ltd. Unit 3 Liosban Business Park, Tuam Road | Ray O'Connor | 7/24/19 | $0 |
| Licensee | Crescent Valley Ltd (South Africa) | Cresent Valley Pty Ltd. 35 Bell Cresent Tokai, WC 7945 | Andrew Douglas | 9/1/17 | $0 |
| Licensee | Sabco Sports (UAE, Oman, Bahrain, Pakistan, Qatar) | Sabco Sports LLC PO Box 3779 PC 112, Ruwi Muscat, Sultanate of Oman | Nic Cartwright | 1/1/19 | $0 |

| Contract Type | Contract Name | Counterparty Address | Counterparty Contact Name | Effective Date | Cure Claims |
|---|---|---|---|---|---|
| Licensee | KHO Capital (Philippines) | KHO Capital<br>832 A. Arnaiz Ave<br>2nd Floor | Jake Zimmerman | 1/1/20 | $0 |
| Licensee | Black Tie Sports (Croatia) | Black Tie Sports Ltd.<br>Wangdun Road 135<br>SIP, Suzhou, China | Marko Martinović | 8/1/18 | $0 |
| Licensee | Realize Massive (Italy) | Realize S.R.L.<br>Piazza IV Novembre<br>4-20124 | Fabiana De Rosa | 12/1/18 | $0 |
| Licensee | TriFactory (egypt) | The TriFactory<br>17 Mansour Mohamed Street<br>Zamalek, Cairo, Egypt 11211 | Ayman Hakky | 5/1/19 | $0 |
| Licensee | Ponto Org Organizacao de Eventos Ltda | Ponto Org Organizacao de Eventos Ltda (Brasil)<br>Rua Arrudas 245 | Henrique Gomes | 6/1/19 | $0 |
| Licensee | Cho TM Korea (South Korea) | Andrew Cho<br>200 Winston Drive<br>Cliffside Park, NJ 07010 | Andrew Cho | 10/1/19 | $0 |
| Licensee | Hamburger Asia (Singapore, Malaysia) | Hamburger Asia Sdn. Bhd.<br>Level 7, Oasis Wing,<br>Brunsfield, Oasis Tower 3, 2, Jalan PJU 1A/7A,<br>Oasis Square, Oasis Damansara<br>47301 Petaling Jaya, Selangor Darul Ehsan | Miyeera Navaretna | 10/1/19 | $0 |
| Vendor / Service Provider | Event Medic | Event Medic NY, Inc.<br>901 North Broadway<br>North Massapequa, New York 11758 | Jeff Saperstein | 3/18/19 | $388.70 |

Assumed Contracts - 1.1.10

## Schedule 1.1.11 - Assumed Events

| Venue Name | Counterparty Address | Counterparty Name | Event Dates | Brief Description | Effective Date | Cure Claims |
|---|---|---|---|---|---|---|
| Camp William B. Snyder (Boy Scouts of America) | 6100 Antioch Rd, Haymarket, VA 20169<br><br>Notice Address:<br>National Capital Area Council, BSA<br>9190 Rockville Pike,<br>Bethesda, MD 20814 | Mario Perez | May 30-31, 2020 | Virginia Venue | 9/25/19 | $25,000 |
| Wild Wings of Oneka | 9491 152nd St. N<br>Hugo, MN 55038 | Jeff Hughes | July 11-12, 2020 | Twin Cities Venue | 4/9/19 | $0 |
| Chicago Rockford International Airport | Greater Rockford Airport Authority<br>2 Airport Cir, Rockford, IL 61109 | Michael Dunn | August 22-23, 2020 | Chicago Venue | 9/30/2019 | $0 |
| Raceway Park | Old Bridge Township Raceway, Inc.<br>230 Pension Rd, Englishtown, NJ 07726 | Michael Napoliello | Sept 12-13, 2020 | Tri-State Venue | 9/18/19 | $108,181 |
| Palmer Coking Coal Company | 31407 WA-169, Black Diamond, WA 98010 | William Kombol | Sept 19-20, 2020 | Seattle Venue | 9/19/19 | $13,879 |
| Lake Elsinore | Storm Events, LLC, 500 Diamond Dr, Lake Elsinore, CA 92530 | Mark Beskid | Nov 14-15, 2020 (will want to shift to October) | So Cal Venue | 9/30/19 | $18,330 |

Assumed Events - 1.1.11